METAL FILM COMPANY, Inc., Plaintiff,

v.

METLON CORPORATION and Acme Backing Corporation, Defendants.

METLON CORPORATION and Acme Backing Corporation, Counterclaimants,

v.

METAL FILM COMPANY, Inc., the Dow Chemical Company and Dow-Badische Company, Counter-defendants.

No. 64–Civ. 508.

United States District Court,
S. D. New York.

July 27, 1970.

Charles B. Smith, Fish & Neave, New York City, for plaintiff, Metal Film Co., Inc., by Lars I. Kulleseid, New York City, of counsel.

Leon, Weill & Mahony, New York City, for defendants, by Frank H. Gordon, Stephen H. Kaprelian, Abe Siegel, New York City, of counsel.

## OPINION

CROAKE, District Judge.

Walter George Scharf went to work in 1916 at the age of seventeen as a gold beater upon the death of his father. Despite the lack of a formal education, he developed exceptional sales, management and technical expertise and was able to make major improvements in gold leafing processing equipment. He remained in this business for over forty years. In 1950 he became interested in metallizing. He started a company called the High Vacuum Metal Company, through which he marketed a yarn composed of metallized Mylar laminated to butyrate. The resultant yarn was used for such products as upholstery in automotive and plane interiors. Perceiving the need for a softer material, however, Scharf developed a new laminated metallized Mylar yarn, and formed a company, Metal Film Company, the plaintiff herein, to develop, manufacture and market this yarn. The resultant yarn was a commercial success in its field, but it was still not soft enough a material for use in fabrics that would come in contact with a wearer's skin.

Scharf recognized the need for a yarn which would have a good "hand" but also a yarn which would stand up under the variety of processing and use conditions to which yarns are subjected. Metallized yarns are woven or knitted into fabrics, normally in combination with ordinary non-metallic yarns. Considerable mechanical stress is placed on the individual metallized yarns in the weaving or knitting operation. Additional mechnical stress and considerable chemical stress are placed on the metallized yarns in the various wet processing steps to which woven or knitted fabrics are commonly subjected before the fabrics are cut and sewn into garments or other products. Metallized yarns are subjected to still further mechanical and chemical stresses during the lifetimes of the garments or other products, for example, the stresses arising during wearing and during dry cleaning or laundering operations (Tr. pp. 72,256). For a metallized yarn to be useful it must be able to withstand the various chemical and mechanical attacks to which it will be subjected over the life of the product.

Scharf turned to the task of developing such a softer yarn, and came up with a non-laminated metallized yarn, and on June 18, 1956 filed a patent application based on this product. A patent was granted, after modification of the application, on March 7, 1961, under the number 2,974,055. That patent is the subject of the instant patent infringement suit by Metal Film Company, Inc., plaintiff, against Metlon Corporation and Acme Backing Corporation, defendants. The principal issues herein are the customary ones in patent infringement litigation, namely, the validity of plaintiff's patent and defendants' infringement of it. Judge Palmieri of this court has previously ordered a separate trial of the antitrust and patent misuse issues raised by defendants' answer and counterclaims; 272 F.Supp. 64 hence, those issues are not before the Court at this time and counter-defendants, the Dow Chemical Company and Dow-Badische Company were not formal participants in the trial.

A civil non-jury trial of this patent infringement action was held before the undersigned and decision was reserved.

By way of introduction to the technical background of the Scharf patent involved here, we note that modern metallic yarns were introduced commercially in about 1946 and represented a considerable improvement over the previously available yarns, e. g., the so-called Lame yarns that had been used for many years (Tr. pp. 64–65). The first im-

portant development among the modern yarns was a three-ply structure in which a central layer of aluminum foil was sandwiched between two layers of clear plastic film. The layers were glued together with an adhesive. The three-ply foil yarn is shown in U. S. patent No. 2,129,504 to Karl E. Prindle, which issued in 1938 to Dow's predecessor, The Dobeckmun Company (Tr. pp. 248–250).

The use of three-ply aluminum foil yarn was limited because fabrics woven or knitted from it were rough (Tr. p. 249; Pl. Exs. 36, 40). Nevertheless, substantial quantities of three-ply aluminum foil yarns were sold and it is only within the last few years (since about 1963) that this type of yarn has declined to an insignificant factor in the metallic yarn market (Tr. p. 249; Pl. Exs. 29, 30A and 30B).

The second important modern development in metallic yarns was the introduction of "laminated" metallized yarn in about 1955. Laminated metallized yarn is made by vacuum metallizing the surface of a polyester plastic film and then adhesively bonding another layer of polyester film to the metallized surface to protect that surface.

The use of a metallized aluminum in place of the aluminum foil resulted in an increased yield in terms of yards per pound, and a yarn of greater flexibility and an improved softness. Laminated metallized yarn is shown in a second Prindle patent, No. 2,714,569, which also issued to The Dobeckmun Company (Tr. pp. 96, 253–256).

The invention of non-laminated metallized yarn, which is the subject of this suit, was the third important development in metallic yarns. The term "non-laminated" is used because this yarn has only one thickness of Mylar [1] (or other substrate), rather than the three thicknesses of the foil yarns [2] and the two (or more) thicknesses of the laminated metallized yarns, and because it does not need the laminating adhesive required by these two earlier types of yarn.

Non-laminated metallized yarns were introduced to the market on a significant commercial basis in 1958 and rapidly became and still are the dominant product in the metallic yarn field, having eclipsed both the foil yarns and the laminated metallized yarns (Pl. Exs. 18, 18A, 18B, 29, 30A, 30B.) [3]

Let us examine the relevant provisions of the patent in suit. The claims allegedly infringed are 1, 3, 4, 9 and 11.

Claim 1 is the principal method claim and sets forth the asserted new combination of method steps characterizing the method of the Scharf invention. The principal product claims are Nos. 4 and 9 and these set forth the product in terms of the new combination of elements which characterize the product of the Scharf invention.

The remaining claims here charged to be infringed are dependent claims. Thus

---

1. Mylar is duPont's trademark for its polymerized ethylene glycol terephthalate plastic sheet (Pl.Ex. 1, col. 2, lines 52–53).

2. The foil itself is so thick as to be considered a "thickness."

3. The non-laminated metallized yarns are sold by plaintiff under the designation NL (Tr. p. 52). We have examined the numerous samples of the various yarns submitted in evidence by the parties. Plaintiff's exhibits 16A–16F are examples of plaintiff's non-laminated metallized yarns and plaintiff's exhibits 17A–17D are examples of fabrics made with plaintiff's NL yarn (Tr. pp. 47–54). Dow's version of the non-laminated metallized yarns produced under the Scharf patent were usually designated 50–C, although other numbers were sometimes used. The designation was changed to C–50 by Dow-Badische (Tr. pp. 93, 96). Plaintiff's exhibits 31 and 32 are examples of the Dow-Badische non-laminated metallized yarns and plaintiff's exhibits 33 and 34 are examples of fabrics made with Dow-Badische non-laminated metallized yarns (Tr. pp. 99–105). Defendants' non-laminated metallized yarns are sold under the designation LMP (Tr. p. 532; Pre-Trial Order, ¶ 3 (a) (3)). Plaintiff's exhibits 3, 3A and 3B are examples of defendants' LMP yarns here charged to infringe the Scharf patent (Tr. p. 597).

claim 3 "depends from" (i. e., incorporates by reference) claim 1 and must be read as including all of the steps of claim 1 plus the added definition of claim 3 that the plastic coating is applied by the rotogravure process. Claim 11 "depends from" claim 9 and adds to the product elements of claim 9 the further requirement that the plastic coating contain a pigment.

These patent claims read as follows:

"1. The method of producing filamentary metallized threads comprising the steps of passing a relatively broad web of flexible, transparent thermoplastic material through a vacuum chamber to plate one surface thereof with a deposit of metal having a thickness not exceeding one-fifth thousandths of an inch, coating the metallized surface of said web with a transparent plastic material in liquid form, drying and curing said plastic coating to form an adherent film on the metallized surface, said plastic material being non-tacky and having substantially the same tensile strength and elongation characteristics as said web material and having an affinity therefor, and slitting the plastic-coated metallized web to form filamentary threads.

      *   *   *   *   *   *

"3. The method, as set forth in claim 1, wherein said plastic coating is effected by the rotogravure process.

"4. A metallized web adapted to be slit to form continuous filament metallized threads comprising a flexible transparent thermoplastic web, a deposit of metal coating one surface of said web and having a thickness not exceeding $1/50,000$ of an inch, and a transparent film formed of a dried and cured non-tacky plastic material in liquid form covering the surface of said metal deposit and adhering directly thereto, said film being of a material having the same tensile strength and elongation characteristics as the material of said web and having an affinity for the material of said web.

      *   *   *   *   *   *

"9. A metallized web adapted to be slit to form continuous filament metallized threads comprising a flexible web formed of polymerized ethylene glycol terephthalate, a deposit of metal covering one surface of said web and having a thickness not exceeding $1/50,000$ of an inch, and a transparent film formed of a dried and cured non-tacky plastic material in liquid form covering the surface of said metal deposit and adhering directly thereto, said film being of a material having the same tensile strength and elongation characteristics as the material of said web and having an affinity for the material of said web.

      *   *   *   *   *   *

"11. A metallized web, as set forth in claim 9, wherein said film includes a pigment."

The method of the Scharf invention is described in particular in the patent specification, with reference to Fig. 1 of the patent drawing, as follows (col. 2, lines 45 et seq. of the patent):

"As shown in Fig. 1, in a process in accordance with the invention for producing a metallized thread, a continuous web of transparent thermoplastic material 10 is drawn from a supply roll 11 and is caused to travel through a high vacuum chamber 12 in which one surface of the film is metallized.

      *   *   *   *   *   *

"In the vacuum chamber, one surface of the film is metal-plated by gold, silver aluminum, magnesium, titanium, nickel or any other metal, the thickness of the metal layer preferably not exceeding $1/50,000$ of an inch.

      *   *   *   *   *   *

"After plating the web is re-rolled in preparation for the next step.

"To produce a yarn having the color properties of the metal deposit, the metallized web is then coated on the metal side with a transparent plastic

**100**

in solution or suspension which is related structurally to and has an affinity for the web which is metallized. That is to say, the plastic coating must have substantially the same tensile strength and elongation characteristics as the web material. This coating can be applied by a roller coater, a reverse roller coater, or by the flexographic or rotogravure process. By way of illustration, Fig. 1 shows a direct three roll coater.

\*    \*    \*     \*    \*    \*

"The wet plastic coating formed on the web 10 is then dried and cured by passing the web through an oven 18 which is properly heated and vented to drive off all solvents and at the same time to effect the curing of the coated material \* \* \*. Thereafter the metallized and coated web may be slit or severed into threads in accordance with the usual practice in this art."

Thus, essentially, the non-laminated metallized yarns of the Scharf patent are prepared by

(1) vacuum depositing metal (usually aluminum) on a transparent plastic web (usually Mylar),

(2) coating the metallized surface of the web with a transparent plastic material in liquid form, the plastic material being one which has certain specified properties including an affinity for the web material,

(3) drying and curing the coating, and

(4) finally slitting the plastic-coated metallized web to form the threads or yarns.

Some concepts in the patent that deserve some further specific definition are those of tensile strength and elongation.

Tensile strength is a well-recognized term in the engineering field in general and in the metallized plastic sheet and metallic yarn fields in particular, and means, to those skilled in such fields, the resistance of a material to lengthwise stress, measured in terms of the force per unit area of cross-section that the

material can bear without breaking or tearing apart.

Elongation is a well-recognized term in the engineering field and in the metallized plastic sheet and metallic yarn fields and means, to all those skilled in such fields, the extent to which a given material will elongate, or "stretch," before it breaks or no longer has the ability to recover. It is expressed in terms of a percentage or proportion of the original size of the material before it is subjected to stress.

█ Now it is clear that to be the subject of a valid patent, the patentee's contribution to the field must be both new and useful. The requirement of "novelty" or newness is spelled out in § 102 of the 1952 Patent Act (35 U.S.C. § 102). But in addition, the patentee's contribution must be more than routinely novel. It must be non-obvious. It must embody "patentable invention" as that concept is defined in § 103 of the Patent Act of 1952 (35 U.S.C. § 103):

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

However, 35 U.S.C. § 282 provides for the statutory presumption of validity of an issued patent, imposing the burden of proof of invalidity upon the party challenging the patent.

This statutory presumption of validity and its concomitant burden on defendant is a codification of case law, Radio Corp. of America v. Radio Engineering Laboratories, 293 U.S. 1, 8, 55 S.Ct. 928, 79 L.Ed. 163 (1934); and Mumm v. Jacob

E. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 676, 81 L.Ed. 983 (1937):

"The issue of the patent is enough to show, until the contrary appears, that all the conditions under which a discovery is patentable in accordance with the statutes have been met. Hence, the burden of proving want of novelty is upon him who avers it. Walker on Patents, § 116. Not only is the burden to make good this defense upon the party setting it up, but his burden is a heavy one, as it has been held that 'every reasonable doubt should be resolved against him.'"

■ Moreover, the presumption of validity is strengthened where, as here, the patent application has been carefully considered by the Patent Office before the patent is granted.[4] Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 132–133 (2d Cir. 1958), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958):

"There are other factors, however, which we must consider. One is that plaintiff is attacking a patent duly issued by the Patent Office. From this flows a presumption of validity, a presumption which is perhaps too often minimized in the courts. * * * Expertness and experience in passing upon patents lie primarily in the Patent Office and these important factors are only partially offset by the greater concentration and the additional relevant evidence which can be brought to bear in any particular patent litigation in the courts. *The presumption of validity is entitled to particular weight when, as here, the file wrapper history discloses a careful* consideration in the Patent Office before issue." (Emphasis added.)

■ The presumption is reinforced also when, as in this case, the most perti-

nent prior art has been considered by the Patent Office during its examination of the application for the patent in suit.[5]

A typical statement of this rule was made by the District Court in Lyon v. Bausch & Lomb Optical Co., 119 F.Supp. 42 (W. D.N.Y.1953), modified 224 F.2d 530 (2d Cir. 1955):

"The presumption of novelty and invention is strengthened since the patents relied on to show lack of invention were considered by the Examiner. There was no showing at the trial that the Examiner was wrong in his conclusion." (119 F.Supp. 45.)

The prior art relied on by defendants falls far short of carrying the heavy burden imposed upon them.

■ Thus, the burden upon defendants of proving the invalidity of the patent is a heavy one. In attempting to sustain this burden, defendants make several major arguments. First, defendants argue that the Patent Examiner was misled by the requirements, set forth in the patent and repeatedly relied upon in urging its issuance, (a) that the protective coating of the patented product have "substantially the same tensile strength and elongation characteristics" as the base web, and (b) that the thickness of the vacuum deposited metal be no more than 1/50,000th of an inch. Defendants further argue (c) that the disclosures of the Scharf patent are defective for describing the coating and base web as "related structurally" and for referring to a portion of the treatment of the coating as "curing."

■ To the extent that defendants argue that a fraud was committed on the Patent Office, they have indeed a heavy burden. As stated in Armour & Co. v.

---

4. Plaintiff's Ex. 2, the Scharf Patent Office file, commonly called the file wrapper, shows that during a period of over four and one-half years, the Scharf patent application was given thorough consideration by the Patent Office.

5. In this case, the Patent Office Examiner considered Prindle patent 2,714,569 covering laminated metallized yarn, as well as eight other patents here cited by defendants as prior art, during the course of the prosecution of the application for the patent in suit.

Wilson & Co., 274 F.2d 143, 148 (7 Cir. 1960):

"It is easy to make charges of fraud, but the law rightfully insists that before legal rights may be based upon such charges, they must be established by clear and convincing evidence. The burden is on the party making charges of fraud to establish same by clear and definite proof."

Plaintiff has attempted to refute each of these arguments propounded by defendants.

As to the patent provisions that the plastic coating have essentially the same tensile strength and elongation characteristics as the Mylar web, plaintiff asserts that this means that the composition and characteristics of the coating and the web complement each other so that as the finished yarn is stretched, twisted and bent during the course of use, the plastic coating moves with the metallized Mylar such that the Mylar and the plastic coating respond as a unit to tensioning stresses.

Defendants, on the other hand, assert that the Scharf patent calls for the plastic coating and the Mylar web each separately to exhibit the same tensile strengths and elongation characteristics. Relying on the undisputed fact that separately the plastic coating with the specific composition of the examples set forth in the patent and the Mylar would virtually never have the same tensile strength and elongation characteristics, defendants argue that the patent is misleading and fails to teach a person skilled in the art how to practice the invention. Plaintiff retorts that in view of this admitted virtual impossibility of having the plastic coating and the Mylar separately exhibit the same tensile strength and elongation characteristics, no man skilled in the art would be misled into believing that such a thing was called for by the patent. Plaintiff argues that a man skilled in the art would recognize that, as the defendants seem to agree, the patent does not make sense if the defendants' interpretations are accepted. Thus, a man skilled in the art would recognize the inappropriateness of the defendants' proposed definitions and would read the patent in such a way as to give the questioned words a meaningful interpretation. Plaintiff concludes that as a consequence, it would be evident to one skilled in the art that the patent calls for a plastic coating and a Mylar web which, when combined in the yarn product, will exhibit the same characteristics within the range of expected use of the yarn.

After hearing the testimony and reviewing the transcript thereof and the extensive and fine arguments of counsel, we have concluded that plaintiff's construction of these provisions of the patent is conclusively persuasive. We note, for instance, the convincing testimony of plaintiff's witness, Charles Davidoff, a consulting chemical and metallurgical engineer, to the following effect:

"Q Now, * * * the portion of the Scharf patent which I quoted you a short while ago, Mr. Davidoff, pointed out that the plastic coating must have substantially the same tensile strength and elongation characteristics as the web material.

"Would you explain what that means to you?

"A That when they stretch they act in unison, as a unit of one. It won't flake; it won't break." (Tr. p. 311.)

It is also interesting to note that like Scharf, defendants' own chemist, Walter Kropf, in his work was interested in the combined performance of the plastic coating and the metallized Mylar in the final product, not their individual behaviors (Tr. p. 514):

"Q Did you make any effort to match the tensile strength and elongation characteristics with any of those base films with the lacquer compositions that you were creating?

"A Well, I really was trying to get the final performance. My comparison was with the laminated yarn, rather.

"At that time the laminated yarn was on the market and this was my target. I wanted to approach the strength of the laminated yarn. *I mean, I didn't separate the lacquer, the performance of the lacquer from the performance of the film. Now the end product was the important thing.*" [Emphasis added.]

█ The language used in the Scharf patent to explain the required characteristics of the coating must, of course, be interpreted realistically, just as this language would be interpreted by a man skilled in the metallized yarn art. Bianchi v. Barili, 168 F.2d 793, 799–800 (9 Cir. 1948). There, the Court rejected the defendant's contention that a claim improperly described the relationship of the elements of a combination:

"Bianchi and Marlo contend that Claim 4 is invalid because, although the cutters, according to the claim, are 'adapted to be positioned between the molds * * * at the point of contact of the rollers,' the patent drawings and the specification 'clearly show and describe the rollers as being spaced apart'. It is argued that Claim 4 is therefore invalid, since it 'improperly describes the relationship of the elements of a claimed combination.'

"The gist of the contention lies in the meaning of the word 'contact'. Bianchi and Marlo apparently assume that the word necessarily implies an actual, physical 'touching'.

"There are several reasons why this narrow construction should not be allowed to invalidate the claim.

"*In the first place, considerable latitude in semantics is permitted to an inventor.* As was said in H. J. Wheeler Salvage Co. v. Rinelli & Guardino, D.C.N.Y., 295 F. 717, 727, '*a patentee has the right to use such words as to him best describe his intention, and they will be so construed as to effectuate that result.*'

"Second, the specification and the claims of a patent are not to be construed with legalistic rigidity. Here, as elsewhere in the law, 'the letter killeth, but the spirit giveth life'. In Topliff v. Topliff and Another, supra, 145 U.S. [156] at page 171, 12 S.Ct. [825] at page 831 [36 L.Ed. 658], the court said:

" 'The specification and claims of a patent, particularly if the invention be at all complicated, constitute one of the most difficult legal instruments to draw with accuracy; and, in view of the fact that valuable inventions are often placed in the hands of inexperienced persons to prepare such specifications and claims, it is no matter of surprise that the latter frequently fail to describe with requisite certainty the exact invention of the patentee, and err either in claiming that which the patentee had not in fact invented, or in omitting some element which was a valuable or essential part of his actual invention. * * * *The object of the patent law is to secure to inventors a monopoly of what they have actually invented or discovered, and it ought not to be defeated by a too strict and technical adherence to the letter of the statute, or by the application of artificial rules of interpretation.*' " (168 F. 2d 799–800) (Emphasis added.)

In Lever Bros. Co. v. Procter & Gamble Mfg. Co., 139 F.2d 633, 640 (4 Cir. 1943), the Court said:

"Without attempting to discuss just what we regard as the precise connotation of each of these terms, we feel that, *read in their context in Bodman's claims and specifications, these terms could be readily understood and successfully followed by experienced makers of soap.*

\* \* \* \* \* \*

"We are dealing with a practical, present field of industry, not with a visionary far-off Utopia. It would be, we think, altogether unreasonable to require strictly that Bodman describe his process only in words with a keen, razor-like connotation.

"Bodman may have lacked a full appreciation of 'beta' and 'omega' soaps; he may not have completely

known, in all their devious ramifications, the theories of 'phase' and 'critical temperatures' of soaps. *The words he used in describing his invention may not have invoked the unqualified praise of the scientific semanticist. But it is our considered opinion that he did develop a novel and important process for controlling the properties of soap by mechanical treatment rather than by chemical changes and formulae, that he was at least 'boldly empirical', and that he proclaimed his invention in such form and fashion that those skilled in the gentle soapmaking art would have little or no difficulty in either understanding his process or in putting this process into practical effect.*" (Emphasis added.)

■ Now it is clear that a patent must describe "the invention, and * * the manner and process of making and using it, in such clear, concise and exact terms as to enable any person skilled in the art * * * to make and use" it, and "particularly [point] out and distinctly [claim] the subject matter which the applicant regards as his invention." 35 U.S.C.A. § 112. The disclosures must describe a process which is operative and must not contain anything which is materially untrue or vague and indefinite. A patent which fails to meet these standards is invalid. 35 U.S.C.A. § 282, subd. (3).

Prindle, a man unquestionably skilled in the art, and in fact recognized by defendants as one of the forerunners in the field, had no difficulty understanding the patent (Tr. pp. 268–271, 274–278). Nor did Davidoff (P.Br. pp. 17–19, 25–26). Nor apparently did defendants' technical director, Robert Tasch, who for trial purposes prepared a sample of lacquered, metallized Mylar, in accordance with the instructions of the patent (Tr. pp. 623–626). And nor apparently did that substantial portion of the industry which has taken licenses under the Scharf patent (P.Br. pp. 62–63). As Judge Learned Hand said in similar circumstances in Musher Foundation v. Alba Trading Co., 150 F.2d 885, 889 (2 Cir. 1945):

"It is impossible to suppose that anyone who really wished to respect the patent would have any difficulty in identifying what the claim covered." See also Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 138 (2 Cir. 1958).

■ Moreover, we note that, as the Court in Standard Coil Products Co. v. General Elec. Co. recognized:

"Courts, with whom the responsibility for construing patents lies, will and should resolve ambiguities in a manner which will preserve the patent." 2 Cir., 306 F.2d 319 at p. 322.

A related patent requirement that the plastic coating be structurally related to and have an affinity for the web means that the composition of the coating and the composition of the web must complement each other so that they will adhere without the use of an adhesive and so that they will act, in service, as a unit of one (Tr. pp. 136–137, 306–307). This effect was one of the chief innovations represented by the instant patent. This involves more than merely having the coating adhere to the metal which overlies the Mylar web. The metal surface is porous, having holes in it which show upon high magnification, so that the plastic coating must adhere not only to the metal but also through the porous metal surface to the underlying web of Mylar (Tr. pp. 351–352).

Defendants further argue, as indicated above, that plaintiff misled the Patent Office by the requirement that the thickness of the vacuum deposited metal not exceed 1/50,000 of an inch. In support of this position, defendants point out that this dimension was variously described as "commercially impractical" (Hammer 138, 140), "not realistic" (Davidoff 368), and by the alleged inventor himself, as "not a critical dimension" (Scharf 710–711). The thicknesses actually used are in the area of one or two millionths of an inch (Hammer 137–138, Davidoff 302). Moreover, there was testimony that if the thickness exceeds this narrower limit, the metal becomes discolored and turns brownish

or blackish (Hammer 140, N. Freydberg 756). Plaintiff, on the other hand, argues that the 1/50,000th of an inch dimension has significance as the dividing line between a self-supporting metal foil and a metal deposit which would take the shape of the base web. (Hammer 136–137, Davidoff 367–368.)

Apparently, it is desirable that there be enough metal so that from a light reflectance standpoint there appears to be a continuous metal surface. (Tr. p. 305.) More metal than this is functionally superfluous and only adds to the cost. (Tr. p. 305.) However, plaintiff indicated that when the thickness of the metal was in the one to two millionths of an inch range, as is generally used in the industry, there were small gaps or holes in the metallization through which the coating might adhere to the base. (PX 48–50A, Davidoff 348–352.)

We have concluded that defendants have failed to satisfy their burden of proof, described above, that this dimension specified in the patent constituted a misrepresentation to the Patent Office as to a critical element of the patent. Defendants have not challenged the accuracy per se of the dimension, but have argued that it is substantially broader than it should have been, in view of plaintiff's actual practice. While this may in fact be the case, we cannot ascribe to it the legal effect defendants urge. Although the upwards limit that has actually been followed is somewhat lower, this does not vitiate the significance of the 1/50,000th dimension as the border line between a self-supporting metal foil and a non-self-supporting coating.

Defendants further argue that the disclosures of the Scharf patent are defective in so far as they provide for "curing" as a portion of the treatment of the coating.

As to drying and curing, the patent states that the plastic coating should be non-blocking [6] and that it should be resistant to the "various dye and cleaning processes, etc." (Col. 4, lines 10–12.) These specific requirements appear to be closely related to the method step of "curing" the plastic coating. Thus, after the plastic coating has been applied to the metallized surface of the Mylar, the metallized and plastic-coated Mylar is passed through an oven to both dry and cure the plastic coating. Drying is what the word implies—causing the solvent content of the coating to be evaporated. (Tr. p. 339.) Curing involves something more. As Davidoff explained (Tr. p. 339):

"Q What is meant by the term 'cured' as used in this passage?

"A The term 'cured' here means where you have driven off practically—you have driven off all the solvents. The material is not only not tacky to the touch any more, but it will not block when it is rolled up into a roll, and that you have taken precautions to make sure that the coating is absolutely infusible at this point."

Dr. Bruins, defendants' expert, acknowledged that in addition to his chemist's definition of "curing" as meaning "cross linking" (Tr. p. 722), "curing" in many cases, including that of the fusion of plastisols, for instance, means a form of drying not involving any "cross linking" (Tr. p. 722),[7] consistent with the definition for "curing" expressed by Davidoff (Tr. p. 339) and Prindle (Tr. pp. 275–276). Bruins further agreed that if by "curing" the patent means "extra drying" that that would correctly describe what occurs in practicing the method of the Scharf patent (Tr. p. 722).

---

6. "Blocking" is the tendency of a material when wound up to adhere to itself. If a metallized yarn, on a spool for weaving or knitting purposes, were to "block," it could not be unwound and would be worthless. (Tr. pp. 340–341.)

7. There was also some testimony, as indicated above, that the plastic coating in fact forms some sort of chemical bond with the Mylar involving cross-linking. (Scharf p. 709.)

Thus, we have concluded that the patent provisions above are in no way defective. Moreover, it is clear to the undersigned that defendants have failed to overcome the presumption of validity of the patent in suit. *See* 35 U.S.C. § 282; Radio Corp. of America v. Radio Engineering Laboratories, 293 U.S. 1, 8, 55 S.Ct. 928, 79 L.Ed. 163 (1934); Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983 (1937); Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 132–133 (2d Cir. 1958), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958); Lyon v. Bausch & Lomb Optical Co., 119 F.Supp. 42 (W.D.N.Y.1953), modified, 224 F.2d 530 (2 Cir. 1955).

The starting point for Scharf's invention was the yarn which he had been making, i. e., the laminated metallized yard of the Prindle 2,714,569 patent in which the metallized Mylar surface was protected by a second sheet of Mylar glued over the metallized sheet (Tr. p. 45). Mr. Scharf, after many efforts (Tr. p. 73), produced a non-laminated metallized yarn in which the metallized surface was protected by a thin plastic coating having the characteristics recited in the patent and treated as described in the patent.

Mr. Scharf was not a chemist.[8] So in order to obtain a coating which would do the job he wanted, Scharf went to a chemist—Arthur Crowell—who worked for Union Paste Company, the supplier of adhesives for his laminated yarns, and told Crowell what kind of coating he wanted (Tr. p. 72).[9] Crowell, after a number of efforts (Tr. pp. 72–73) supplied the composition which is actually disclosed in the Scharf patent (Tr. pp. 73, 707; Defts. Ex. B). That coating is only one of many compositions which can be used in practicing the Scharf invention, as shown, for example, by the different compositions used commercially by plaintiff and defendants (Tr. pp. 344–345, 644–645).

The particular plastic coating disclosed in the Scharf patent is not itself Scharf's invention. It is merely one example of a coating which was found that would work—a coating which met the requirements which Scharf established.

█ Mr. Scharf did not contribute a specific chemical formulation. Rather, his contribution was the definition of what the characteristics of that coating formulation must be and the combination of that coating with the other steps of the method and elements of the product. That Scharf used the services of a chemist to help in reducing his invention to practice does not affect the validity of his patent. Agawam Woolen Company v. Jordan, 7 Wall. 583, 74 U.S. 583, 19 L.Ed. 177 (1868); Technical Tape Corp. v. Minnesota Mining & Mfg. Co., 143 F.Supp. 429 (S.D.N.Y.1956), aff'd, 247 F.2d 343 (2 Cir. 1957), cert. denied, 355 U.S. 952, 78 S.Ct. 537, 2 L.Ed.2d 529 (1958). In *Technical Tape*, Judge Bicks of this Court stated:

> "It is asserted that Drew is not the true inventor of the patent in suit. Admittedly, Drew did have other hands help him in the manual work incident to following through his ideas and conceptions, but aid thus rendered does not elevate the helpers to the rank of inventors or co-inventors nor alter Drew's status as the sole inventor." 143 F.Supp. 437.

*See also*, P & D Sales & Mfg. Co. v. Winter, 334 F.2d 830, 836 (7 Cir. 1964):

> "We feel similarly that the Trial Court erred in holding that Mr. Winter was not the sole inventor and that the patent was invalid for that reason.

---

8. He had very little formal education, as indicated above, having had to leave high school after the first year in order to support his mother and sisters (Tr. pp. 29–30).

9. Mr. Snyder, President of Nyclo (the plant where the development work was done, testified (Tr. p. 604):
   "Yes, Mr. Scharf gave instructions for anything that we produced, laminated, coated, slit or anything else, we did as he directed."

The findings do not indicate the basis for this conclusion, but perhaps the District Judge considered Mr. Salzman, the engineer employed by Mr. Winter, to be a joint inventor. Mr. Winter is not himself an engineer familiar with specific electrical details, but close scrutiny of his testimony shows that when he retained Mr. Salzman to build a model for exhibition, he did set out exactly what he wanted done. He does not claim invention of specific switches, motors or timers. The patent states that the mechanism is controlled and actuated by conventional electrical components. Even if Mr. Salzman did make discoveries ancillary to the plan of his employer, Mr. Winter is still the inventor of the original improved principle and the ancillary discoveries may be embodied in his patent."

The specific composition developed by Crowell at Scharf's instruction was included in the specification of the Scharf patent in order to teach the art what was then (1956) the best means known for carrying out the invention (Tr. pp. 704–705) as required by statute.[10] The composition itself was no more the invention than was the duPont Mylar substrate which also was disclosed (Pl. Ex. 1, col. 2, line 52; col. 6, line 7).

The patentable contribution of the Scharf patent resides in the combination of method steps and the combination of elements which together make up the method and product of the patent (Tr. pp. 411–412). The individual method steps and product elements are not the invention; their combination is. This was also the case in the recent Second Circuit decision in Shaw v. E.B. & A.C. Whiting Company, 417 F.2d 1097, 1101 (1969), where the Court observed as follows:

> However, the fact that each element of a creation sought to be patented is found in the prior art does not negate

novelty if the old elements are combined in such a way that as a result of the combining an improved, useful, and more advantageous innovation is obtained. Grinnell Washing Mach. Co. v. E. E. Johnson Co., 247 U.S. 426, 432, 38 S.Ct. 547, 62 L.Ed. 1196 (1918); cf. Reiner v. I. Leon Co., 285 F.2d 501, 503 (2 Cir. 1960).

A study of the prior art, both that specifically considered by the Patent Examiner and that now relied upon by defendants, reveals that the patent in suit meets the said requirements for patentability.

Defendants have cited as prior art 19 United States patents and five publications. In addition, defendants called witnesses who testified about work performed before the filing date of the application for the Scharf patent.

Metallic yarns were known at the time the Scharf invention was made in 1956. The principal prior art yarns were the metallic foil yarn described above consisting of a sandwich of aluminum foil between two sheets of clear plastic, shown in Prindle patent 2,129,-504, and the laminated metallized yarn consisting of a sheet of metallized plastic with another sheet of plastic adhesively laminated over the metallized surface, as shown in Prindle patent 2,714,569. Neither of these Prindle patents shows the invention of the Scharf patent in which the yarn is made by providing a transparent plastic coating over a metallized plastic sheet, the coating having the properties and characteristics described in the Scharf patent and considered above. The thinner, and therefore softer, Scharf yarn is a resut of the use of only a single layer of Mylar as compared to the two or more layers in the Prindle yarns, and the fact that no adhesive is needed to hold the components together as in the Prindle yarns.

It was also known that a plastic coating could be used to protect a metallic or metallized film, for example, as described

---

10. 35 U.S.C. § 112 provides, *inter alia*, that the specification "shall set forth the best mode contemplated by the inventor of carrying out his invention."

in an article by one Bancroft in *Modern Plastics* magazine for December 1953. But the concept of using a plastic coating having the properties and characteristics specified in the Scharf patent for making a non-laminated yarn is not suggested in the Bancroft article or in the other similar prior art references cited by defendants. These references include articles from *Modern Plastics* magazine for December 1946, April 1950 and September 1954, the Hammer article from *Product Engineering* magazine for August 1955, Korver patent 2,689,802, and Lion patent 2,774,421.

A number of the patents cited by defendants relate to vacuum metallization, but are not otherwise pertinent to the Scharf patent—and are no more pertinent in this regard than the Prindle patent 2,714,569, which was considered by the Patent Office during the prosecution of the Scharf patent application.

Wickmann patent 2,039,372 shows the use of metal for its light and thermal radiation properties. Wickmann describes an insulation material which might be used, for example, as a wrapping material or as an inner lining for hats. Wickmann teaches the use of a metal deposit much thicker than that of the Scharf patent. And while Wickmann discloses a lacquer coating to protect the metal against abrasion and tarnishing, there is no suggestion that this coating have the characteristics required by the Scharf patent. Wickmann contains no suggestion that his material be used in a yarn.

Hyman patent 2,106,457 is directed to a fabric prepared by the use of warp bands comprising a plurality of flat strips of material having a metallic luster. It is suggested that these warp bands be cut from a self-sustaining sheet of metal, be made by flattening round wires or be cut from a metal coated paper or other substrate. The patent is entirely silent on the subject of a protective coating. Hyman says nothing about using his materials in yarn.

Thomas Hammer testified that in 1954 or 1955 some of his customers applied lacquer coating to "trim, or scrap" from his metallizing operation to make ribbons and novelty metallic yarns. Hammer had no record of any such material and the sales of such materials continued only until he was "able to produce better quality material" (Tr. pp. 155–156, 170).

Whatever may have been the nature of the trim and scrap material which Hammer sold, it made no impression on the metallized yarn market. There is no evidence as to the kind of lacquer coating used, or that the material would be suitable for Scharf type yarn.

Joseph Resch, vice president of defendant Acme's wholly-owned subsidiary, Metallic Yarns, Inc., identified a roll of lacquered metallized plastic film which he testified was characteristic of such products sold by his company in the early 1950's for the "gift tying ribbons" business (Tr. pp. 414–415, 437–443; Defts. Ex. H).

Irrespective of its suitability for "gift tying ribbons" and the like, it is apparent that the material was wholly unsuitable to be slit into yarns to be used in the knitting or weaving of fabrics for garments (Tr. pp. 448–460; Defts. Ex. H; Pl. Ex. 51).

Walter Kropf, a chemist for defendant Acme from October 1952 until October 1961, and Acme's technical director from July 1967 until sometime in 1969, testified that he conducted a series of experiments in 1953 seeking a usable lacquer coating for aluminized sheets of acetate or Mylar (Tr. pp. 505, 508; Defts. Ex. I). The results of Kropf's work were admittedly inconclusive. Moreover, they were admittedly abandoned and had no apparent impact on the development of non-laminated metallized yarns (Tr. pp. 502–504, 512–514, 527–528, 564–566; 743).

At the time when Scharf started his search for a thinner, softer metallized yarn there was a distinct need for such a yarn which could be used in the knitting and weaving of fabrics. The existing metallized yarns were not satisfactory for many end uses, notably for garments. The non-laminated, lacquer

coated, metallized yarn invented by Scharf and covered by the Scharf patent satisfied this need (Tr. pp. 249, 256; Pl. Ex. 6).

Earlier work with lacquer-coated, metallized plastic materials, such as the work performed in 1952–53 by employees of the defendants, would have suggested to those skilled in the art that non-laminated, lacquer-coated, metallized yarns would not be practical. Thus, Prindle, a man clearly skilled in the pertinent art, was "amazed" when he was first shown the new Scharf non-laminated yarn in 1956 (Tr. pp. 237, 256–261, 267, 604).

Yarns made pursuant to the invention of the Scharf patent have achieved undoubted commercial success and have taken over a major portion of the metallized yarn market (Tr. pp. 56–57, 110; Pl. Exs. 18–18B, 23–24, 29–30B).

Dow, a leading producer of metallized yarns and owner of both prior art Prindle patents which cover the laminated metallized yarn and the laminated metal foil yarn, has taken a license under the Scharf patent. Other manufacturers of metallic yarns have also taken licenses (Tr. pp. 73–82, 96, 260; Pl. Exs. 20, 23–24).

There is considerable evidence that after the patented product was first marketed by plaintiff and by Dow in the late 1950's, the defendants obtained samples of the products made by plaintiff and by Dow in order to develop their own products, now charged with infringement, so as to be able to compete in the market. Within about a year of first marketing the non-laminated yarn now charged with infringement, that yarn had completely displaced the laminated metallized yarn previously marketed by the defendants (Tr. pp. 472–473, 476, 480–488, 500–501, 504, 552–553, 558–562, 585–597, 758–759, 789–791).

Thus, Scharf's discovery that a metallized Mylar surface could be properly protected with an appropriate plastic coating which, after being slit into the thinner, softer, non-laminated yarn, would still stand up under the severe stresses of both chemical and mechanical attacks was a significant contribution to the art.

We have concluded for the various reasons indicated that Claims 1, 3, 4, 9 and 11 of Scharf patent 2,974,055 are valid. *See, e. g.*, Shaw v. E. B. & A. C. Whiting Company, *supra*; United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). Likewise, we have concluded that the invention disclosed and claimed in Scharf patent 2,974,055 is novel, is not anticipated by the prior art, and would not have been obvious to a man of ordinary skill in the metallized yarn art in 1956. *See, e. g., id.;* United States v. Adams, *supra*.

Accordingly, defendants' counterclaim for a declaratory judgment that patent 2,974,055 is invalid and has not been infringed by defendants is dismissed.

Having determined the validity of the patent, we must now proceed to the question of infringement. Notwithstanding defendants' denial of their infringement of the Scharf patent, the facts with respect to defendants' LMP product and defendants' methods of making the LMP product are such that the fact of defendants' infringement of the Scharf patent claims in suit, Nos. 1, 3, 4, 9 and 11,[11] is clear.

Infringement was proved at the trial through Davidoff's testimony based on examination and analysis of defendants' products. Davidoff testified in detail how all the elements of the claims are found in defendants' LMP yarn and in its method of production (Tr. pp. 352–359, 406–408). However, in large measure, infringement was also established

---

11. For purposes of this discussion, the two defendants, which are closely related companies, will be considered as one. Actually, Metlon sells and Acme manufactures, but the infringing acts of one can be deemed the infringing acts of the other on the basis that one has induced the infringement of the other (35 U.S.C. § 271 (b)). In their own operations, defendants do not distinguish between the two companies (Tr. p. 473).

through admissions of defendants' officers, Ralph and Norman Freydberg.

In the following tabular presentation, the elements of claim 1 are set forth in the left column and defendants' admissions which establish the presence of corresponding steps in the defendants' production method appear on the right.

| *Claim 1* | *Admissions* |
|---|---|
| The method of producing filamentary metallized threads comprising the steps of passing a relatively broad web of flexible, transparent thermoplastic material through a vacuum chamber to plate one surface thereof with a deposit of metal having a thickness not exceeding one-fifty thousandths of an inch, | Defendants have outside suppliers [12] vacuum metallize Mylar on one side (Tr. pp. 478, 480, 534–535). The metal which is vacuum deposited is aluminum (Tr. p. 535). The metal thickness "is so thin as not to be mechanically measurable" (Tr. p. 537). The actual metal thickness according to Normal Freydberg's understanding appears to be .000002" (Tr. pp. 537–538). Since the 1/50,000 of an inch of claim 1 is .00002 inch, it is clear that defendants' metallization is within the limits of claim 1.[13] |
| * * * coating the metallized surface of said web with a transparent plastic material in liquid form, | Defendants coat the metallized surface of the web with what they call a "lacquer" (Tr. pp. 485–486); it is a transparent plastic material applied in liquid form (Tr. p. 544). |
| * * * drying and curing said plastic coating to form an adherent film on the metallized surface, | The plastic material is heated to drive off the solvents from the coating and to form an adherent non-tacky film (Tr. pp. 544–545). |
| * * * said plastic material being non-tacky and having substantially the same tensile strength and elongation characteristics as said web material and having an affinity therefor, | The plastic material is non-tacky after it is dried (Tr. p. 492) and the coating material stretches with the Mylar without flaking off or breaking up when the yarn is subjected to elongation in normal use (Tr. pp. 492–493). The coating has an affinity for the web material.[14] |
| * * * and slitting the plastic-coated metallized web to form filamentary threads. | Defendants slit the plastic-coated metallized web to a yarn width of 1/64 inch (Tr. p. 481). |

12. That defendants choose to have the vacuum metallizing, which was a conventional step (used, for example, in producing the Prindle laminated yarn), done by outside suppliers does not mitigate their infringement of the overall process. Crowell v. Baker Oil Tools, 143 F.2d 1003, 1004 (9 Cir. 1944); cert. denied, 323 U.S. 760, 65 S.Ct. 93, 89 L.Ed. 608 (1944).

13. Davidoff testified that he measured the thickness of the metal on defendants' material (Pl.Ex. 5) as 2.7 millionths of an inch, considerably under the 20 millionths (1/50,000) top limit of claim 1 (Tr. p. 353).

14. Ralph Freydberg testified:
"Q. What are the characteristics of the coasting for the Metlon LMP that you would look for? A. Clarity, flex resistance and above all good adhesion to the base web." (Tr. p. 489).

Claim 3 adds to claim 1 the element that the plastic coating be applied by the rotogravure process. It is this process defendants use for applying their plastic coating (Tr. pp. 490, 544).

Claim 4 is a product claim reading as follows:

"4. A metallized web adapted to be slit to form a continuous filament metallized threads comprising a flexible transparent thermoplastic web, a deposit of metal coating one surface of said web and having a thickness not exceeding 1/50,000 of an inch, and a transparent film formed of a dried and cured non-tacky plastic material in liquid form covering the surface of said metal deposit and adhering directly thereto, said film being of a material having the same tensile strength and elongation characteristics as the material of said web and having an affinity for the material of said web."

That product claim 4 has been infringed by defendants is evident from the discussion of method claim 1 above. The same is true also of product claim 9 which differs from claim 4 essentially only in defining the web material as polymerized ethylene glycol terephthalate (Mylar). And Mylar is the web material which defendants have used in their commercial LMP product (Tr. p. 478).

Claim 11 adds to product claim 9 the element that the film (plastic coating) include a pigment. Defendants include a pigment in the coating when they want a particular color (Tr. p. 489).

Thus, each element and step called for by claims 1, 3, 4, 9 and 11 is found in defendants' non-laminated yarn product (Metlon LMP) and the method of manufacturing that product.

Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950):

"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it."

Defendants' LMP products fall clearly within claims 4 and 9 of the Scharf patent, their colored LMP products also fall clearly within claim 11 of the Scharf patent, and defendants' method of manufacture falls clearly within claims 1 and 3 of the Scharf patent. Infringement is thus made out.[15]

Thus, defendants Acme Backing Corporation and Metlon Corporation have infringed claims 1, 3, 4, 9 and 11 of Scharf patent 2,974,055 by utilizing the methods claimed in claims 1 and 3 of said patent and by selling products embodying claims 4, 9 and 11 of said patent. 35 U.S.C. § 271; Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

Accordingly, plaintiff is entitled to judgment enjoining defendants, their officers, servants, agents and those in privity with them and each of them from further infringement of United States patent No. 2,974,055, and to an accounting for damages to which plaintiff is entitled, as a result of defendants' past infringement; entry of such judgment is to be deferred until a determination of the misuse defense raised by defendants' counterclaim in a separate trial

---

15. It is clear that before defendants' LMP yarn came on the market in any volume in late 1962, defendants had studied the Scharf patent and had obtained and tested samples of Metal Film's non-laminated yarn (NL) and Dow's non-laminated yarn (C–50) (*supra*, pp. 64–66). Irrespective of whether defendants deliberately copied plaintiff's or Dow's Scharf type yarn, however, infringement is clearly made out, since neither lack of knowledge of the patent nor lack of intent to infringe is a defense on the issue of infringement. Freedman v. Friedman, 242 F.2d 364, 366 (4 Cir. 1957); Ames Shower Curtain Co. v. Heinz Nathanson, Inc., 285 F.Supp. 640 (S.D.N.Y.1968).

as provided for in Judge Palmieri's order of July 5, 1967.

Finally, the Court would like to express its appreciation for the fine performance of counsel on both sides, Charles B. Smith for plaintiff, with Lars I. Kulleseid and Jules P. Kirsch of counsel, and Frank H. Gordon for defendants, with Stephen H. Kaprelian and Abe Siegel of counsel. The case was well tried and the papers were outstanding.

The foregoing Memorandum Opinion shall constitute the findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

So ordered.