**EPICREALM, LICENSING, LLC**

v.

**AUTOFLEX LEASING, INC., et al.**

**epicRealm, Licensing, LLC**

v.

**Franklin Covey Co., et al.**

**Nos. 2:05CV163, 2:05CV356.**

United States District Court,
E.D. Texas,
Marshall Division.

June 26, 2007.

Jones, Jr., Jones & Jones, Marshall, TX, Jeffrey Wayne Moles, Quinn Emanuel Urquhart Oliver & Hedges, LLP, New York, NY, for Epicrealm, Licensing, LLC.

Charles Ainsworth, Parker Bunt & Ainsworth, Tyler, TX, Eric M. Albritton, Attorney at Law, Longview, TX, Ira P. Rothken, Rothken Law Firm, San Rafael, CA, Margaux A. Aviguetero, Otto O. Lee, Intellectual Property Law Group, LLP, San Jose, CA, Matthew Richard Rodgers, Williams Morgan & Amerson PC, David J. Beck, Beck Redden & Secrest, Houston, TX, J. Stephen Ravel, Jonathan M. Buck, Kelly Hart & Hallman, Joseph Roger Williams, Jr., Andrews Kurth LLP, Austin, TX, Aaron Levangie, William D. Belanger, Pepper Hamilton LLP, Boston, MA, Damon Michael Young, Lance Lee, Young Pickett &˙ Lee, Texarkana, TX, Charles Samuel Cotropia, Kristoffer B. Leftwich, Sidley Austin Brown & Wood, Kenneth Robert Adamo, Jones Day, Paul Alexander Bezney, Tracy Lynn Stoker, Adkerson, Hauder & Bezney, Dallas, TX, A. Gregory Gibbs, Ognjan V. Shentov, Richard H. An, Jones Day, New York, NY, Carl R. Roth, Michael Charles Smith, The Roth Law Firm, P.C., Marshall, TX, William J. Brown, Jr., Jones Day, Irvine, CA, Ludwig E. Kolman, Pope Cahill & Devine Ltd., Robert S. Beiser, Stanley B. Block, Vedder Price Kaufman & Kammholz, Chicago, IL, Michael W. Tieff, Steven J. Rocci, Woodcock Washburn LLP, Philadelphia, PA, Tyler Alexander Baker, Fenwick & West, Mountain Valley, CA, Michael J. Sacksteder, Fenwick & West, San Francisco, CA, for Autoflex Leasing, Inc., et al. and Franklin Covey Co., et al.

Larry Dean Carlson, Kevin James Meek, Baker Botts, Dallas, TX, Andrew Wesley Spangler, Elizabeth L. Derieux, Sidney Calvin Capshaw, III, Brown McCarroll, Thomas John Ward, Jr., Ward & Smith Law Firm, Longview, TX, Deborah J. Race, Otis W. Carroll, Jr., Ireland Carroll & Kelley, Tyler, TX, Franklin

### MEMORANDUM ORDER

FOLSOM, District Judge.

The above-entitled and numbered civil action was heretofore referred to United

States Magistrate Judge Caroline M. Craven pursuant to 28 U.S.C. § 636. The Report of the Magistrate Judge which contains her proposed findings of fact and recommendations for the disposition of such action has been presented for consideration. Plaintiff epicRealm Licensing, LLC ("Plaintiff") filed objections to the Report and Recommendation of the Magistrate Judge. The Court conducted a *de novo* review.

## BACKGROUND

[E]picRealm Licensing, LLC ("Plaintiff" or "epicRealm") sued The Macerich Company ("Macerich") and other unrelated companies (collectively "Defendants"), alleging Defendants are infringing United States Patent Nos. 5,894,554 (the "'554 patent") and 6,415,335 (the "'335 patent") (collectively the "Patents"). The Patents allegedly encompass certain systems and methods to dynamically generate web pages. Plaintiff's Patents purport to cover a process in which a web server interacts with a page server and other data sources to generate dynamic web pages that are subsequently transmitted over the Internet.

## REPORT AND RECOMMENDATION

In her Report and Recommendation dated February 21, 2007, the Magistrate Judge recommended Macerich's Motion for Summary Judgment of No Infringement be granted and that Plaintiff's above-entitled and numbered cause of action against Macerich be dismissed with prejudice. Specifically, regarding direct infringement, the Magistrate Judge found no genuine issues of material fact regarding whether Macerich performs any of the steps of the claimed methods. Therefore, the Magistrate Judge concluded Macerich cannot be liable for direct infringement of those claims as a matter of law. Regard-

ing indirect infringement (inducing infringement), the Magistrate Judge found insufficient evidence to demonstrate that Macerich had specific intent to cause the acts which constitute the infringement. The Magistrate Judge further found there are no genuine disputes of material fact on the issue of whether Macerich intended to induce infringement. Therefore, the Magistrate Judge concluded Macerich cannot be liable for active inducement as a matter of law.

## PLAINTIFF'S OBJECTIONS

Plaintiff filed objections to the Magistrate Judge's recommendation that Macerich's motion for summary judgment of no infringement be granted. Specifically, Plaintiff raises the following three primary objections to the Magistrate Judge's Report and Recommendation. First, Plaintiff asserts the Magistrate Judge's direct infringement analysis improperly applied the statutory mandate of 35 U.S.C. § 271(a) by focusing only on whether Macerich directed or controlled its web hosting services provider—Red 5 Interactive, Inc. ("Red 5")—in making one of the infringing systems named in Plaintiff's Preliminary Infringement Contentions ("PICs")—the system including Apache and Tomcat software. According to Plaintiff, making the software is only one way to infringe Plaintiff's patents under 35 U.S.C. § 271(a), and Macerich is also liable for infringement by using the infringing systems and methods. Plaintiff argues the Magistrate Judge's analysis ignored evidence showing that Macerich used the infringing combination of Apache and Tomcat software.

Second, Plaintiff contends the Magistrate Judge incorrectly required Plaintiff to produce evidence that Macerich directed Red 5 to "customize" the infringing combination of Apache and Tomcat software. According to Plaintiff, its PICs accuse

Macerich of infringement by employing a system that used an Apache web server in combination with a Tomcat page server, and neither Plaintiff's patents nor its PICs require that Macerich "customize" the Apache/Tomcat combination. Again, Plaintiff argues the *use* of the combination, by itself, is sufficient for infringement.

Third, Plaintiff asserts the Magistrate Judge's analysis of infringement by inducement improperly applied the statutory mandate of 35 U.S.C. § 271(b) by again focusing only on whether Macerich induced Red 5 in making the infringing system. Plaintiff states the analysis did not consider evidence that Macerich induced web patrons to use the allegedly infringing combination of Apache and Tomcat software when browsing Macerich's websites.

### *DE NOVO* REVIEW

The Court first notes that Plaintiff, in its objections, attempts to raise new factual and legal issues by putting forth entirely new arguments that have never before been briefed. Through four separate legal briefs arguing its position and at oral argument, Plaintiff has focused on Macerich's connection and dealings with Red Five as its sole basis for arguing Macerich is liable for the web servers operated by Red Five. In that regard, Plaintiff relied on cases like *Hill v. Amazon. com,* 2006 WL 151911 (E.D.Tex.2006), which base liability for the actions of one party on a another party according to the connection and dealings between the two. Not once in its briefs or at oral argument did Plaintiff cite *NTP, Inc. v. Research in Motion, Ltd.,* 418 F.3d 1282 (Fed.Cir.2005), to argue that Macerich could use the accused Apache and Tomcat software without actually controlling it. The basis for this argument is entirely new.

Likewise, this is the first time that Plaintiff has alleged that Macerich induces

visitors to its web sites to use the accused Apache and Tomcat software. In the briefing before the Magistrate Judge, Plaintiff discussed Red Five's use of the software in providing web hosting to Macerich as the only alleged direct infringement underlying its allegations of inducement. In its objections, Plaintiff has changed its position to argue that its claims of inducement are supported by a different type of infringing use. Again, this is an entirely new argument, and it is unsupported by the law.

The Fifth Circuit has held that issues raised for the first time in objections to a Report and Recommendation of a magistrate judge are not properly before the district judge. *United States v. Armstrong,* 951 F.2d 626, 630 (5th Cir.1992); *see also Finley v. Johnson,* 243 F.3d 215, 219 n. 3 (5th Cir.2001). Thus, the Court is under no obligation to address the arguments raised for the first time in Plaintiff's objections. Even if the Court were under an obligation to address the new arguments, the Court would find Plaintiff's objections without merit for the following reasons.

Contrary to Plaintiff's first objection, the Report and Recommendation did address the issue of Macerich's "use" of the accused combination of Apache and Tomcat software. The Magistrate Judge specifically found that "Macerich does not take part in or control the operation of the Accused Systems. Instead, the Accused Systems are owned, operated, managed, and controlled by Red Five...." Report and Recommendation at pgs. 629–30. "Operation" is clearly the "use" that is implicated when dealing with patents directed to "a method and apparatus for managing dynamic web page generation requests" and accusations directed to web server computers and software.

The Magistrate Judge found that Macerich did not take part in operating the accused software, or in selecting it, or in configuring it and putting it to use. Report and Recommendation at pgs. 629–30. Instead, Red Five, and not Macerich, used the accused software in the course of its business as a web hosting provider. *Id.* at pg. 630. Having drawn that conclusion, the Report and Recommendation analyzes whether Macerich controlled Red Five's actions so as to be liable for them, and it correctly concludes that Macerich did not. *Id.* at pgs. 633–34.

■ Macerich does not use the accused Apache and Tomcat software because it is not responsible for running that software to manage incoming requests to a web server. The patents in suit "claim[ ] a method and apparatus for managing dynamic web page generation requests." '554 Patent at col. 2, lines. 17–19. The claims, in turn, recite the steps involved in managing web page requests: intercepting a request, routing a request, dispatching a request, etc. *See, e.g.,* claim 1 of the '554 Patent. Likewise, the apparatus claims recite structure configured, or software programmed, to carry out those steps. *See, e.g.,* claim 9. Thus, in the context of the claimed invention, the allegedly infringing "use" of Apache and Tomcat must be the operation of the software to manage dynamic web page requests. That use is made by a web hosting provider, and not by the party that makes a request or sends information to a web server. The web hosting provider, and not the requester, manages a request, and here, Red Five, and not Macerich, runs the Apache and Tomcat software to manage incoming requests on its web servers.

■ Similarly, Macerich does not use the Apache and Tomcat software when it uses the Property Site Manager ("PSM") tool. The tool is simply a web-based application, like web-based email or any number of other dynamic web pages. To access the tool, Macerich must log in and make a request to Red Five's server, which processes the request just like any other request for a dynamic web page. Macerich does not run Apache and Tomcat to manage this request. Red Five runs Apache and Tomcat to manage the requests that Macerich sends to the web server, and Apache and Tomcat respond and present the PSM tool according to the configuration and operation set by Red Five. Report and Recommendation at pgs. 629–30. Macerich cannot affect that configuration or operation through the PSM tool.

■ Despite Plaintiff's arguments to the contrary, the issue of control is central to determining whether a party is liable for "using" a claimed invention. In *NTP, Inc. v. Research in Motion, Ltd.,* 418 F.3d 1282 (Fed.Cir.2005), the Federal Circuit stated that "use" of a claimed system under 35 U.S.C. § 271(a) occurs at "the place at which the system as a whole is put into service, i.e., the place where control of the system is exercised and beneficial use of the system obtained." *Id.* at 1317. In *NTP,* the defendant's customers were "users" of a claimed system for transmitting messages because they controlled the transmission of messages within the system by manipulating a system component. *Id.* In particular, the defendant's customers operated handheld Blackberry devices, and by "manipulating" those devices, the system would transmit or deliver messages at the time chosen and as directed by the defendant's customers. *Id.* Importantly, the claimed system in *NTP* was directed to a system for the transmission of messages, *see id.* at 1294–95, and that is exactly the function that the defendant's customers controlled. *Id.* at 1317. Thus, the defendant's customers were users of the system.

Unlike the Blackberry user in *NTP,* Macerich cannot control Apache and Tomcat to manage incoming web page requests. When Macerich logs in and accesses the PSM tool, Apache and Tomcat manage and respond to the request according to the configuration and operation set by Red Five. Macerich cannot control the method or process employed to manage and respond to the request. Macerich merely submits requests to the web server for the PSM tool, but the management of the request by Apache and Tomcat is controlled entirely by Red Five. Red Five, and not Macerich, is like the Blackberry user because Red Five runs Apache and Tomcat in the context of the patent claims to receive and respond to Macerich's requests. Thus, under *NTP,* Macerich is not a "user" of the accused Apache and Tomcat software, and Macerich cannot be directly liable for infringement.

Regarding Plaintiff's second objection, the Court finds the Magistrate Judge correctly considered the issue of customization in determining whether Macerich controlled Red Five's use and operation of Apache and Tomcat. The Magistrate Judge correctly considered this evidence and concluded that Macerich did not control Red Five's use of the software.

■ Finally, regarding Plaintiff's third objection regarding Macerich's liability for inducing infringement, the Court finds there is no act of infringement because visitors to Macerich's web site are not "using" the Apache and Tomcat software within the meaning of § 271(a). Persons who send requests to a web server and receive a response do not control the operations of the Apache and Tomcat software in managing incoming web page requests. Instead, Red Five, as the web host, operates the software which manages and responds to the incoming requests according to the configuration set by Red Five. Visi-

tors are not allowed to control the manner in which the web site manages a request or generates a response. It is this method of managing and responding to requests, and not a method of sending a request and receiving a response, that is claimed by the patents in suit. '554 Patent at col. 2, lines 17–19 ("[T]he present invention claims a method and apparatus for managing dynamic web page generation requests."). Thus, it is the method of managing requests which must be controlled if it is to be used, and that control is exercised by Red Five, not by visitors to Macerich's web site.

Thus, the web site visitors are not users of the patented system. *See NTP,* 418 F.3d at 1317. Instead, they are like people who send e-mail to a Blackberry user from a desktop computer and receive a response. Those people may be indirect beneficiaries of the claimed system, but they are not its "users" under § 271(a) because somebody else exercises control. *Id.* Accordingly, Macerich cannot be liable for inducing infringement by its web site visitors because those visitors are not, in fact, infringing users of the accused software. *Joy Techs., Inc. v. Flakt, Inc.,* 6 F.3d 770, 773 (Fed.Cir.1993).

■ In addition, Macerich cannot be liable for inducing infringement because it neither encourages web visitors to use Apache and Tomcat nor intends to cause actual infringement. The intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement. *DSU Med. Corp. v. JMS Co.,* 471 F.3d 1293, 1306 (Fed.Cir. 2006). A plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements; the requirement that the alleged infringer knew or should have known his actions would in-

duce actual infringement necessarily includes the requirement that he or she knew of the patent. *Id.* at 1304. Inducement "requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *Id.* at 1306. In *DSU,* the Federal Circuit approved a jury finding that there was no intent to cause infringement where the alleged inducer did not believe the accused product infringed despite knowing the allegations of infringement by the patentee. *Id.*

Here, Macerich does not induce infringement because it does not actively encourage the use of Apache and Tomcat nor does it intend to cause actual infringement. Macerich only provides web pages which web users may visit. Macerich has no control over the selection or operation of the software that Red Five uses to serve Macerich's web pages. Macerich does not even control whether its web pages are programmed in the language that can be processed by Tomcat, which is Java. All of those decisions are within Red Five's "domain of control." Report and Recommendation at pg. 630 *(citing* Chrystal Depo. at pgs. 231–232). Thus, Red Five, and not Macerich, is solely responsible for the use of Apache and Tomcat.

Plaintiff's objections are without merit. The Court is of the opinion that the findings and conclusions of the Magistrate Judge are correct. Therefore, the Court hereby adopts the Report of the United States Magistrate Judge as the findings and conclusions of this Court. Accordingly, it is hereby

**ORDERED** that Macerich's Motion For Summary Judgment of No Infringement (Civil Action No. 2:05–CV–163, Dkt. No. 159; Civil Action No. 2:05–CV356, Dkt. No. 188) is **GRANTED.** It is further

**ORDERED** that Plaintiff's above-entitled and numbered cause of action against The Macerich Company is **DISMISSED WITH PREJUDICE.**

## *REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

CRAVEN, United States Magistrate Judge.

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for Assignment of Duties to United States Magistrate Judges, Macerich's Motion For Summary Judgment of No Infringement (Docket Entry # s 159/188) was referred to the Honorable Caroline M. Craven for the purpose of making a report and recommendation. The Court, having reviewed the relevant briefing and hearing arguments of counsel, is of the opinion Macerich's motion should be **GRANTED.**

### I. Background

[E]picRealm Licensing, LLC ("Plaintiff" or "epicRealm") sued The Macerich Company ("Macerich") and other unrelated companies (collectively "Defendants"), alleging Defendants are infringing United States Patent Nos. 5,894,554 (the "'554 patent") and 6,415,335 (the "'335 patent") (collectively the "Patents"). The Patents allegedly encompass certain systems and methods to dynamically generate web pages. Plaintiff's Patents purport to cover a process in which a web server interacts a page server and other data sources to generate dynamic web pages that are subsequently transmitted over the Internet.

### II. Macerich's Motion

On June 6, 2006, Macerich filed its Motion For Summary Judgment of No Infringement. In its motion, Macerich asserts it does not belong in this lawsuit because it does not make, use, sell or

import the patented invention nor does it perform any of the acts that Plaintiff has identified as giving rise to the alleged infringement. Specifically, Macerich asserts the *www.macerich.com* website and the links provided at www.macerich.com to the websites for the individual shopping centers are not served from a web server belonging to Macerich. Instead, the websites are hosted on a third-party web server. Macerich states it does not own, operate, control, or direct the operation or control of the web servers; rather, Macerich purchases web hosting services from an independent, third party company known as Red Five Interactive, Inc. ("Red Five").

Plaintiff opposes Macerich's motion, asserting Macerich communicates specific needs to Red Five, and Red Five works closely with Macerich to meet those needs, delivering customized web hosting services to Macerich. According to Plaintiff, Macerich knows all about the software on the relevant Red Five server and is fully aware of the practices and methods employed by Red Five in serving Macerich. Plaintiff further asserts Macerich approved and encouraged these specific practices and methods in the past. Therefore, Plaintiff contends Macerich is liable for direct infringement and for inducement to infringe.

Macerich, in reply, asserts the question before the Court is not whether Macerich worked closely with Red Five after the allegedly infringing systems were implemented to coordinate the launch of websites for its shopping mall properties, develop tools to manage the content of those websites, and optimize the look and feel of its web pages; rather, the question before the Court is whether and to what extent Macerich participated in the selection, design, and implementation of the allegedly infringing web servers in 2003. Regarding this question, Macerich contends the evidence is unequivocal that Macerich had no involvement in selecting, designing, and/or implementing those web servers. For this reason, Macerich asserts the Court should grant its motion for summary judgment of no infringement.

In its surreply, Plaintiff asserts there is a strong connection between Macerich and Red Five. Specifically, Plaintiff asserts (1) Macerich operates under a written agreement with Red Five; (2) Macerich employees work directly with Red Five employees on a daily basis; (3) Red Five provides customized web hosting services to Macerich, and Red Five does not perform any of these services until Macerich has reviewed and approved the cost and scope of the projects through signed work authorizations; (4) Macerich has designated Nick Cardamon at Red Five as the "Administrative Contact" for "macerich.com." (Lerner Dep. at 21, ex. 2). Macerich has also designated Red Five as the "Technical Contact" for its website. (Lerner Dep. at 24, ex. 2); [1] and (5) Ed Coppolla, the Executive Vice–President of Macerich, helped found Red Five and also served on the Board of Directors of Red Five and owned a controlling interest in the company until 2002. Plaintiff asserts Macerich's Reply concedes that it had a close working relationship with Red Five after the implementation of the Apache and Tomcat software, but contrary to Macerich's assertion, Plaintiff states this close working relationship existed long before Red Five began using the Apache and Tomcat software to host Macerich's websites.

With leave of Court, Macerich filed a reply to Plaintiff's surreply, asserting

---

**1.** Plaintiff contends Macerich, by designating Red Five in these capacities, has represented to its domain name registrar, Network Solutions, that Red Five was its agent.

Macerich did not have any control over the selection and implementation of the web server selected by Red Five. Macerich asserts it also did not authorize the continuing use of any particular web server. According to Macerich, it is irrelevant that Macerich authorized work to develop and improve a software tool called the Property Site Manager ("PSM") because the tool is just for content management. Macerich further contends it is irrelevant that the PSM tool works with Apache and Tomcat; it works with Apache and Tomcat only because Red Five chose to implement it on a server running that software, and not as a result of any choice by Macerich. According to Macerich, the current version of the tool, called SiteMan, runs on a system that does not include Tomcat at all.

On October 9, 2006, Plaintiff filed a response to Macerich's sur-surreply. On January 10, 2007, Macerich filed a brief presenting additional evidence in support of its motion for summary judgment. Plaintiff responded to the additional brief, again clarifying its Preliminary Infringement Contentions accuse Macerich of using, not necessarily customizing, the Apache software in combination with the Tomcat software.

The Court conducted a hearing on Macerich's motion on January 23, 2007. Macerich's motion is ripe for consideration.

### III. Summary Judgment Standard

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits and other evidence available to the Court establish that there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). The movant bears the responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, to-gether with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Topalian v. Ehrman*, 954 F.2d 1125 (5th Cir.1992), *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

The nonmovant is not required to respond to a motion for summary judgment until the movant first meets its burden of demonstrating that there are no factual issues warranting trial. *Ashe v. Corley*, 992 F.2d 540 (5th Cir.1993). Once the movant has shown the absence of material fact issues, however, the opposing party has a duty to respond, via affidavits or other means, asserting specific facts showing that there is a genuine issue for trial. FED.R.CIV.P. 56(e). It is not enough for the party opposing summary judgment to rest on mere conclusory allegations or denials in his pleadings. *Topalian*, 954 F.2d at 1131. The nonmovant must point out, with factual specificity, evidence demonstrating the existence of a genuine issue of material fact on every component of the nonmovant's case. *Dunn v. State Farm Fire & Casualty Co.*, 927 F.2d 869, 872 (5th Cir.1991). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986). In assessing the proof, the court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Court's responsibility is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. The inquiry is "the threshold inquiry of

determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *see also Cooper v. Ford Motor Co.,* 748 F.2d 677, 679 (Fed.Cir.1984); *see also SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1116 (Fed.Cir.1985)(*en banc*)("[T]he district court must view the evidence in a light most favorable to the nonmovant and draw all reasonable inferences in its favor, . . . and must resolve all doubt over factual issues in favor of the party opposing summary judgment."); *Hibernia Nat'l. Bank v. Carner,* 997 F.2d 94, 97 (5th Cir.1993). The Federal Circuit has held that "summary judgment is as appropriate in a patent case as in any other." *Barmag Barmer Maschinenfabrik A G v. Murata Mach., Ltd.,* 731 F.2d 831, 835 (Fed.Cir.1984); *see also Meyers v. Brooks Shoe, Inc.,* 912 F.2d 1459, 1461 (Fed.Cir.1990)(summary judgment is appropriate in patent cases).

### IV. Summary Judgment Evidence

### A. Macerich's Evidence

### 1. The Lawsuit

The epicRealm Patents (Exs. 1 & 2) are said to describe and claim methods and apparatus that can be used by and with a web server to manage custom websites.[2] Web servers are computers programmed to respond to requests received from users of the World Wide Web. Web servers transmit, or "serve," web pages, or "content," in response to a request.

In early 2000, epicRealm, formerly known as InfoSpinner, Inc., went into business operating a network of web servers to maintain a distributed cache of dynamically-generated e-commerce web pages (Ex. 10)(Ex. 11). Backed by $90 million in venture capital funding, epicRealm sought to compete with successful industry players such as Akamai Technologies, Inc (Ex. 11), but epicRealm ran into financial trouble in 2001 (Ex. 12). EpicRealm ceased operations early in 2003 (Ex. 13).

Plaintiff filed this lawsuit against Macerich in August of 2005. Plaintiff filed similar lawsuits against 11 unrelated companies in May and August of 2005. Plaintiff has accused each defendant of infringing both of the epicRealm Patents under 35 U.S.C. § 271(a), (b), and/or (c). *(See, e.g.,* Plaintiff's Second Amended Complaint ¶ 17). All of these lawsuits have now been consolidated. The defendants are in diverse markets, as disparate as online dating and matchmaking services, herbal and vitamin supplements, and automobile glass.

On December 22, 2005, epicRealm served its Preliminary Infringement Contentions ("PICs") pursuant to Patent Rule 3–1, accusing Macerich of infringement by operating web servers configured according to the claims of the epicRealm Patents to host its websites. Macerich is in the business of owning and operating shopping centers throughout the United States. (Aff. of Eric Salo ¶ 3). Macerich has one or more websites where interested persons can learn about the company and its shopping center properties *(Id.* ¶ 4). Macerich does not make, own, operate, control, or direct the operation or control (either directly or indirectly) of the web servers hosting its websites, and it has never done so. (Aff. of Marc Lerner ¶ 6)(Salo Aff. ¶ 6). Instead, Macerich has outsourced

---

**2.** According to Macerich's motion, the two patents share the same specification and claim similar subject matter. The '335 patent (Ex. 2) issued from a divisional application split off from the application for the '554 patent (Ex. 1). The two patents name the same inventors and claim the same priority date.

the hosting of its websites to a web hosting provider. *(Id.).*

## 2. Background Of The Patented Technology

The World Wide Web refers to all of the content stored on web servers and other computers that is accessible via the Internet. ('554 patent, 1:14–17). This content exists in the form of web pages that form websites, stored on the web servers. *(Id.* at 1:23–24). A web server may store numerous web pages, each accessible by a unique address known as a Uniform Resource Locator ("URL") *(Id.* at 1:24–38). Typically, internet users access the World Wide Web using web browsers, such as Internet Explorer, that run on their computers (called "web clients" or simply "clients"). *(Id.)* A user can access a particular web page by entering the appropriate URL in his web browser. *(Id.)* The user's request is directed to and processed by the web server containing the requested web page. *(Id.)*

In the early days of the World Wide Web, web pages contained only static content. Once created, the content did not change unless the website manager, or "web master," made changes. ('554 patent, 1:41–44). Subsequently, web pages were designed to be dynamic; the content of a web page could change depending upon the nature of the request. *(Id.* at 1:47–56). Plaintiff concedes that web servers could, and did, serve dynamic web pages before the alleged invention described in the epicRealm Patents *(Id.* at 1:47–67, 3:64—4:31). However, Plaintiff contends that prior art web servers were inefficient because the web server itself handled all of the requests for static and dynamic content, and this overwhelmed the web server. *(Id.* at 4:11–51). Plaintiff says that its patents address this purported deficiency. *(Id.* at 4:51–53.)

According to Plaintiff, its Patents claim systems and methods that relieve the web server from processing requests for dynamic web pages and free up the web server to handle other incoming requests. The apparatus claims of the epicRealm Patents are similarly directed to computer systems and software that accomplish the claimed methods. *(See* '554 patent, claims 9–11). Thus, in the epicRealm Patents, the web server only processes requests for static content (static web pages), and requests for dynamic content (dynamic web pages) are redirected to one or more other servers, which Plaintiff calls page servers.

According to the patent specification, the "web client" (200) *(i.e.,* the internet user's computer) makes a request to a web server based on the URL entered by the user. ('554 patent, 4:54–56). This request is directed to the appropriate web server (201). *(Id.* at 4:55–57). Requests for dynamic content are not processed at the web server by the web server executable. Rather, they are intercepted by an interceptor (400) that directs the request to a page server (404) via a dispatcher (402). *(Id.* at 4:58–60). The page server then processes the request for dynamic content. *(Id.* at 5:37–42). While the page server is handling requests for dynamic content, the web server is released to process other requests. *(Id.* at 5:12–20).

For purposes of this motion, Macerich asserts it is sufficient and undisputed to note that all claims, both method and apparatus claims, of the epicRealm Patents are directed to the inner workings of a computer system that cause the above to occur. Therefore, according to Macerich, epicRealm has accused it of infringement by operating web servers allegedly configured according to the claims of the epicRealm Patents. *(See* epicRealm's PICs). However, Macerich asserts only the party that makes, owns, operates, or controls

those web servers can perform the acts allegedly covered by epicRealm's claims, and Macerich does not make, own, operate, or control any of the accused web servers. (Lerner Aff. ¶ 6)(Salo Aff. ¶ 6). Further, Macerich asserts it has not directed others to use or control computer systems in a specified way on its behalf. (Dooley Aff. ¶ 7)(Lerner Aff. ¶¶ 10–11)(Salo Aff. ¶¶ 10–11).

### 3. Macerich's Websites

Internet users can learn about Macerich and its shopping centers through its website, *www.macerich.com,* or by following links provided at *www.macerich.com* to the websites for the individual shopping centers. (Salo Aff. ¶ 4). These websites are not served from a web server belonging to Macerich. (Lerner Aff. ¶ 6)(Salo Aff. ¶ 6). Instead, the websites are hosted on a third-party web server. (Salo Aff. ¶¶ 6–7)(Lerner Aff. ¶¶ 6–7)(Dooley Aff. ¶¶ 5–6). Macerich does not own, operate, control, or direct the operation or control of the web servers hosting its websites. (Lerner Aff. ¶ 6)(Salo Aff. ¶ 6)(Dooley Aff. ¶¶ 5, 7). Macerich has never done so. *(Id.)* Instead, Macerich purchases web hosting services from an independent, third-party company known as Red Five Interactive, Inc. ("Red Five"). (Lerner Aff. ¶ 7)(Salo Aff. ¶ 7).

Red Five controls the web servers, hardware, and software used to serve Macerich's websites (Lerner Aff. ¶ 7). In the past, Red Five has owned, assembled, operated, maintained, and controlled all of the web servers, hardware, and software used to serve Macerich's websites *(Id.).* Recently, Red Five has outsourced some or all of the hosting of Macerich's websites to another company *(Id.).*

Macerich designs the layout, or "look," of the web page and provides the page's information and content *(Id. ¶ 9).* Mace-

rich provides the web pages and content to Red Five, and Red Five selects the hardware and software it will use to serve Macerich's web pages and content. Macerich does not take part in the selection. *(Id. ¶ 10).* Red Five selects and implements the hardware and software according to its own judgment *(Id.)*(Salo Aff. ¶¶ 9–10).

Macerich does not approve the hardware or software choices made by Red Five. (Lerner Aff. ¶ 11). Red Five submits work authorizations to Macerich in terms of cost and time required to implement a system, and Macerich approves the work authorizations on those terms *(Id.).* The work authorizations do not present details of the specific hardware, software, or technology that is being employed *(Id.).*

Until this suit was filed, Macerich knew almost nothing about the computer systems being used to host its web pages. (Salo Aff. ¶¶ 11–15)(Lerner Aff. ¶¶ 11–12)(Dooley Aff. ¶¶ 7, 12). Red Five indicated a plan to use Apache and Tomcat software on only one occasion during Lerner's management of Macerich's website program; that information was communication to Jim Chrystal, a lead programmer at Red Five, during a discussion about a website project which was being considered by Macerich (Lerner Aff. ¶ 12). Chrystal mentioned that he planned to use software applications called Apache and Tomcat in connection with the project *(Id.).* At the time, Lerner was not familiar with the applications, and he did not understand that they were applications used to host websites *(Id.).* "Apache" and "Tomcat" were not mentioned in connection with any other project *(Id.).* At most, Macerich knew the name of one software application running on Red Five's servers. *(Id.)*

Macerich's websites could have been, and were in fact, hosted on at least two

differently configured and alternative computer systems between 1999 and today. (Dooley Aff. ¶¶ 8–10, 16, and 18). For the majority of that period, Macerich's websites were hosted on computer systems that used noninfringing technology, namely CGI technology, that Macerich asserts is admitted prior art to the epicRealm Patents. *(Id.)(see also,* '554 patent, 4:11–31 and Fig. 3). Macerich's websites are hosted on those same systems today (Dooley Aff. ¶¶ 16 and 18).

Red Five—and not Macerich—selects and configures, owns, operates, and controls the web servers where Macerich's web pages reside and where URL requests to *www.macerich.com* are processed (Dooley Aff. ¶¶ 5–8). The server configuration using Apache and Tomcat software was not dictated by Macerich nor was it dictated by the design or content of Macerich's web pages; rather, it was merely a convenient alternative for Red Five's service at the time *(Id.* ¶ 11). Macerich did not encourage the use of the Accused Systems *(Id.* ¶ 7). Macerich did not inquire into the technology employed *(Id).* Macerich was unaware of the patents-in-suit until served with the complaint in August of 2005. (Salo Aff. ¶ 16).

Chrystal, a former employee of Red Five who worked directly on the Macerich account while Red Five was using the accused combination of Apache and Tomcat software to serve Macerich's web pages (Chrystal Dep. at 25–26), testified that the Property Site Manager allowed Macerich to configure website content (Chrystal Dep. at 228) but did not allow Macerich to configure or otherwise affect the operation of the software components accused of infringement in epicRealm's PICs (Chrystal Dep. at 228–30). According to Chrystal, Macerich never specified which software to use in serving its web pages, or how that software should be configured or coded, or

even how their web pages should be coded. (Chrystal Dep. at 231–33, 255–56). Macerich was never even given the opportunity because those decisions were solely within Red Five's control. (Chrystal Dep. at 232–33).

## B. Plaintiff's Evidence

Macerich is in the business of owning and operating shopping centers throughout the United States. (Salo Dep. at 13). Macerich provides shopping center information and promotes its services through its various websites. (Salo Dep. at 14)(Lerner Dep. at 13–14). Macerich owns approximately 85 websites that provide information and promote services to both mall tenants and mall shoppers. (Salo Dep. at 14)(Lerner Dep. at 13–14).

In 1988, Robert Dooley, the current President of Red Five, bought his former company, Court Avenue Networks, and transformed it into Red Five. (Dooley Dep. at 6, 10). Macerich's relationship with Red Five probably began in 1997 (Salo Dep. at 28–29, 50). Macerich had previously used Court Avenue Networks for its web hosting services. (Dooley Dep. at 10). Mr. Dooley's brother-in-law, Ed Coppolla, assisted Mr. Dooley in the buyout of Court Avenue Networks. (Dooley Dep. at 94–95). Mr. Coppolla is an officer and director of Macerich—the Executive Vice-President. He held that position when he helped found Red Five in 1997. (Salo Dep. at 71–72, ex. 16). Mr. Coppolla owned a controlling interest in Red Five (51%) from 1997 until 2002 and served on the Board of Directors of Red Five until at least 2002. (Dooley Dep. at 95–56)(Salo Dep. at 71, ex. 16).

Red Five provides a variety of special, customized web hosting services to Macerich pursuant to a written agreement. (Lerner Dep. at 27, 49, 78–79)(Salo Dep. at 31, ex. 4). When Macerich has a specific

need with regard to web hosting, it communicates that need to Red Five, who then creates a proposal called a work authorization. (Lerner Dep. at 29–30, 32)(Dooley Dep. at 46–47). A work authorization includes the cost and the scope of the work that Red Five will perform to implement the specific Macerich need. (Lerner Dep. at 29–30, 32)(Dooley Dep. at 46–47)(*see, e.g.,* Dooley Dep. at 38, 58, exs. 7, 10). Red Five had to have a signed work authorization every time it did work for Macerich (Lerner Dep. at 32). When Red Five performed a job that was specific to Macerich, Red Five would not do the job without the direction of Macerich (Lerner Dep. at 33). Even though Red Five is not supposed to perform any specific work for Macerich until Macerich has authorized the cost and the scope of the work through a signed work authorization, sometimes work happened "outside the work authorizations." (Salo Dep. at 40–42)(Dooley Dep. at 51–52). In a busy year, Red Five may do up to six or seven specific projects for Macerich. (Dooley Dep. at 50).

Macerich employees work closely with Red Five on a daily basis to ensure that Macerich's websites run properly and efficiently. (Salo Dep. at 40)(Dooley Dep. at 50–51). Red Five also designates a project coordinator to implement work authorizations that are approved by Macerich. (Lerner Dep. at 31–32)(Dooley Dep. at 47–49). Macerich employees communicate their specific needs to the project coordinator, who then "coordinate[s] all activity" on the project. (Lerner Dep. at 21–22, 32)(Dooley Dep. at 48, lines 1–12). Mr. Lerner testified at his deposition that "the project coordinator is the project manager serving as Macerich's representative in the project." (Lerner Dep. at 32, lines 15–17). Mr. Lerner also testified that one of his key responsibilities is to manage Red Five, and after Macerich approves a Red Five work authorization, he and Red Five

"work through making it happen." (Lerner Dep. at 70–74, lines 9–13).

Red Five also works with Network Solutions, a domain name registrar, to provide domain name registration and management services to Macerich. (Lerner Dep. at 20–25, ex. 2). Nick Cardamon at Red Five is designated as the administrative contact for www.macerich.com. (Lerner Dep. at 21, ex. 2). Red Five is also designated as the technical contact for the domain name. (Lerner Dep. at 24, ex. 2). In their capacity as the administrative and technical contacts, Mr. Cardamon and Red Five interact with Network Solutions on Macerich's behalf to resolve any issues regarding the registration and hosting of the domain name. (Lerner Dep. at 22–25)(Dooley Dep. at 34–35).

At Macerich's request, Red Five also provided Macerich with a content management tool called Property Site Manager ("PSM"). (Lerner Dep. at 17–18)(Dooley Dep. at 39–40). PSM allowed Macerich employees to log into the server used to host Macerich's websites and make changes to/update the content that appeared on the sites. (Lerner Dep. at 38–40)(Dooley Dep. at 39). Red Five provides content management tools to several of its other clients. (Dooley Dep. at 40).

However, there were a couple of features in Macerich's PSM that were unique to Macerich; it was customized in some aspects for Macerich. (Dooley Dep. at 40). Red Five housed PSM on the same server containing the Apache and Tomcat software used to host Macerich's websites. (Dooley Dep. at 42–43). The content for Macerich's web pages was stored on Red Five's server as Java server page ("JSP") files. (Dooley Dep. at 100–101). PSM was a Java servlet application that was executed by Tomcat to form web pages using these JSP files. (Dooley Dep. at 102).

When Macerich requested that Red Five make changes to the PSM known as "admin modifications," Red Five would add functionality to the server and write new JSP code (Java code), which interacts with the Tomcat software. (Dooley Dep. at 40–42, 101–102).

For example, Macerich requested that Red Five add functionality to the server that would allow Macerich to post "Top Ten Gift Lists" on its websites. (Dooley Dep. at 40–42). To accommodate Macerich's request, Red Five had to modify the Java code that the Tomcat software was executing:

Q: Did you have to write some particular code or change the Java code based on the request that Macerich was making for a change in the PSM Tool?

A: We would have—yeah, we probably would have had to modify not only the code of the PSM, but we would have had to add code to add that functionality, yeah.

(Dooley Dep. at 41–42).

Q: So when, for example, Macerich wanted the change for the Top Ten List, did you have to make some configuration change to the Apache web server and the Tomcat servlet container to allow for the Top Ten List and the PSM Tool?

A: No configuration changes, no. It would have just been added servlet changes, so the servlet container was really where the—the servlet container, the way I understand it, executes the code, so the servlet is where we were making the changes. So that would have been where the changes were made.

Q: So you had the change the code for the Tomcat servlet container?

A: No, we wouldn't have been modifying the code for the—I mean, we wouldn't have been modifying Tomcat itself. We were modifying the code that it was executing.

Q: So you were modifying the code that Tomcat was executing to allow for the change that Macerich was requesting in terms of this Top Ten List?

A: Yes.

(Dooley Dep. at 44). When Macerich requested changes to PSM, Red Five would write new code to allow PSM to interact with the Apache and Tomcat server software used to host Macerich's websites. (Dooley Dep. at 40–45).

In one work authorization, Macerich requested that Red Five alter PSM to allow certain Macerich employees to manage content on Macerich's websites. (Dooley Dep. at 53–54). Red Five prepared a work authorization notifying Macerich that it would need to update the "Sales and Specials JSP code" on the server to accommodate Macerich's request. (Dooley Dep. at 38, 53–54, ex. 7). Macerich approved this work authorization. (Dooley Dep. at 53–54).

In another work authorization, Macerich requested that Red Five develop a centralized database of information regarding the retailers at Macerich's shopping centers—the "Retailer Contact Management System." (Dooley Dep. at 58–61, ex. 10). Macerich directed Red Five to create this new system by "leverag[ing] the existing Macerich Internet infrastructure in term[s] of core web components." (Dooley Dep. at 58–61, ex. 10). Mr. Dooley testified that the "existing Macerich Internet infrastructure" and "core web components" referred to PSM and "everything else," meaning the mallsites themselves.[3]

**3.** Plaintiff asserts the "everything else" encompasses the Apache and Tomcat server software that was being used at the time to host Macerich's websites.

(Dooley Dep. at 59, line 12–60, line 13). Macerich ultimately executed this work authorization. (Dooley Dep. at 61).

Red Five began using the Apache and Tomcat software identified in epicRealm's Preliminary Infringement Contentions to host Macerich's corporate website in early 2003, and Red Five transitioned the remainder of Macerich's websites to the Apache and Tomcat software in the fall of 2004. (Dooley Dep. at 13–15). Prior to this transition, Red Five was hosting Macerich's websites on a system using an Apache web server in connection with Common Gateway Interface ("CGI") technology. (Dooley Dep. at 12). Mr. Dooley testified that the transition to Apache and Tomcat was made because the old method had become "an antiquated way of doing stuff." (Dooley Dep. at 15, lines 7–16).

On June 17, 2004, Macerich approved a work authorization that allowed Red Five to host Macerich's individual mall websites using the Apache and Tomcat server software. (Dooley Dep. at 73–75, ex. 14). Mr. Dooley testified at his deposition that Macerich requested and approved a work authorization for this project, which included the transition of the mall websites over to the Apache and Tomcat software:

Q: What was the 'Macerich Mallsite Redesign 2004?'

A: That was the—that was the upgrade that we did to the look and feel of the Mallsites, and that would have been when we did the—if I'm right, yeah, this is when we changed everything over to Java.

\* \* \*

Q: You said when you switched over to Java. Is that what you are talking about, when you switched over to the Apache/Tomcat transition?

A: Yes.

\* \* \*

Q: And this is the method that you were moving over to host the web site; correct?

A: Yes.

Q: So this is a work authorization to essentially to host the Macerich web site under this new system, correct?

A: Yes.

(Dooley Dep. at 73–75, ex. 15). Macerich executed this work authorization on June 17, 2004. (Dooley Dep. at 73–75, ex. 15).

A May of 2004 document entitled "Disaster Recovery Plan Internet Services" outlines Macerich's plan to recover data from Red Five's servers in the event of a natural disaster. (Lerner Dep. at 91–95, ex. 19). The document notes that Red Five backs up its Apache web server configurations and Tomcat application servers on a nightly basis. (Lerner Dep. at 93–95, ex. 19).

On November 6, 2004, Mr. Lerner at Macerich requested via email that Red Five assist in correcting error messages that were appearing on several of Macerich's websites. (Dooley Dep. at 75–81, ex. 15). In response to Mr. Lerner's request, Red Five employee James Chrystal notified Mr. Lerner via email on November 7, 2004, that Red Five was hosting Macerich's websites through the use of the same Apache and Tomcat server software identified in epicRealm's Preliminary Infringement Contentions. (Dooley Dep. at 75–81, ex. 15)("We use two pieces of software to serve your mall sites: Apache HTTP and Jakarta Tomcat."). Mr. Chrystal also notified Mr. Lerner that both the Apache web server software and the Tomcat servlet container software had been reconfigured and updated to satisfy Macerich's needs. (Dooley Dep. at 78–79, ex. 15). Mr. Dooley confirmed the contents of the email in his deposition:

Q: So configuration changes had to be made to Apache and Tomcat to fix this problem?

A: Apparently he had to handle the redirect. I believe he had to change the configuration on Apache.

Q: It looks like he had to change it on Tomcat too, correct?

A: I'm assuming because he mentions both, yes, that he would have to have it in both places.

(Dooley Dep. at 80, lines 11–19).

Mr. Dooley also testified that James Chrystal likely explained to Marc Lerner the changes that Red Five made to the server architecture when it transitioned Macerich's websites to the Apache and Tomcat software:

Q: [D]id Red Five ever communicate to Marc Lerner exactly how the architecture was changed or the technical details about it?

A: ... Jim was a very technical guy and tended to give technical explanations; and so as the guy who ran the application team, if you asked him something, he would have given you a very technical reason for it to the point of kind of confusing most clients. But, yeah, I mean, in the course of those kind of things [Mr. Lerner] probably was made aware of what kind of stuff was changed.

(Dooley Dep. at 108, line 25–109, line 17).

Macerich continued to use Red Five to provide it with the alleged infringing web hosting services. (Lerner Dep. at 77–78, 104–106)(Salo Dep. at 55–56). In early 2005, Mr. Lerner created an internal memorandum evaluating Red Five's performance and suggesting that Macerich continue to use Red Five as its web hoster. (Lerner Dep. at 104, ex. 23). In that memo, Mr. Lerner stated: "Given the interdependencies of our internet compo-nents, additional costs, and time to rebuild our Internet sites, the logical recommendation is to stay with Red Five...." (Lerner Dep. at 104–106, ex. 23). When asked in his deposition what internet components he was referring to in the memo, Mr. Lerner testified "[t]he way the content was able to be put on Macerich.com as well as the property sites." (Lerner Dep. at 105, lines 5–8).

## V. Discussion

### A. Plaintiff's claims against Macerich

In its Complaint, Plaintiff alleges that defendants are infringing the claims of its patents "as defined by *35* U.S.C. § 271(a), (b), and/or (c)." Second Amended Complaint ¶ 17. Section 271(a) defines direct infringement. Sections 271(b) and (c) define inducement to infringe and contributory infringement, respectively. Plaintiff is asserting against Macerich only claims of direct infringement and inducement to infringe under 35 U.S.C. § 271(a) and (b). To the extent that the language from its Second Amended Complaint quoted above constitutes the assertion against Macerich of a claim for contributory infringement under *35* U.S.C. § 271(c), Plaintiff moved, in its response to Macerich's motion, to withdraw that claim.

### B. Direct Infringement

#### 1. 35 U.S.C. § 271(a)

■ Liability for infringement under 35 U.S.C. § 271(a), referred to as "direct infringement," can be found only if an accused infringer "makes, uses, offers to sell, or sells" the patented invention within the United States, or if it "imports" the patented invention into the United States. "To prove direct infringement, the plaintiff must establish by a preponderance of the evidence that one or more claims of the patent read on the accused device literally or under the doctrine of equivalents."

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed.Cir.2005). Direct infringement occurs only when an accused product or process "contains each limitation of a claim, either literally or by an equivalent." *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed.Cir.2005); *see also Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention....").

■■ When the patent claim is for a method or process, it is directly infringed only by one performing the steps of the patented process. *Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed.Cir. 1993)("A method claim is *directly* infringed only by one practicing the patented method.")(emphasis in original). There can be no liability under 35 U.S.C. § 271(a) for direct infringement of a method or process claim where the accused infringer does not itself perform any of the steps set forth in one or more of the asserted claims. *See Atlantic Thermoplastics Co. v. Faytex Corp.*, 970 F.2d 834, 836 (Fed.Cir.1992)(Patentee could not charge defendant with infringement of process claims where defendant distributed but did not manufacture innersoles made by infringing process). Similarly, direct infringement of a device, product, apparatus or system claim occurs only for the person or entity that assembles or employs an apparatus containing each and every limitation of the claim, either literally or under the doctrine of equivalents. *See, e.g., Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1310 (Fed.Cir.2005)(Manufacturer of medical device could not be liable for direct infringement of apparatus claims where doctors using medical device assembled infringing apparatus while performing surgery).

■■ In the case of method patents, federal courts have held that "a party cannot avoid liability for infringement by having someone else perform one or more steps of the patented process for them." *E.I. DuPont De Nemours & Co. v. Monsanto Co.*, 903 F.Supp. 680, 735 (D.Del. 1995), *aff'd*, 92 F.3d 1208, 1996 WL 403285 (Fed.Cir.1996). "When infringement results from the participation and combined action(s) of more than one person or entity, they are all joint infringers and jointly liable for patent infringement." *On Demand Machine Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1344–45 (Fed.Cir.2006)(approving of jury instruction). Joint liability for direct infringement arises where the infringement results from the "participation and combined action(s) of one or more persons or entities." *Id.* at 1345.

■■ Joint liability for infringement does not arise, however, where entities act independently of one another, *see Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d at 1311, or where there is no control of one entity by the other, *see Mobil Oil Corp. v. Filtrol Corp.*, 501 F.2d 282, 291–92 (9th Cir.1974). The Federal Circuit has never directly addressed the issue of whether a party who does not perform every step of a method claim may, nevertheless, be liable for direct infringement of the claim when all of the steps are ultimately performed but by separate entities. *Marley Mouldings Ltd. v. Mikron Indus., Inc.*, 66 U.S.P.Q.2d 1701, 1703, 2003 WL 1989640 (N.D.Ill. 2003). The Fifth Circuit has "question[ed] whether a method claim can be infringed when two separate entities perform different operations and neither has control of the other's activities." *Id., quoting Mobil*

*Oil Corp. v. Filtrol Corp.,* 501 F.2d 282, 291–92 (9th Cir.1974).

In *On Demand Machine Corp. v. Ingram Indus., Inc.,* 442 F.3d 1331 (Fed.Cir. 2006), a panel of the Federal Circuit approved a jury instruction stating that "when infringement results from the participation and combined actions of more than one person or entity, they are all joint infringers and jointly liable for patent infringement." The language of the jury instruction is taken directly from *Shields v. Halliburton Co.,* 493 F.Supp. 1376, 1389 (W.D.La.1980), *aff'd,* 667 F.2d 1232 (5th Cir.1982). In *Shields,* an infringing grouting process was carried out by Halliburton Co. with assistance from employees of Brown and Root while building off-shore oil rigs. *Id.* at 1388. For example, on one rig, Halliburton employees pumped grout while Brown and Root employees controlled and maintained air pressure as required in the claimed method. *Id.* Brown and Root employees also performed the first welding and sealing step of the process on the rig. *Id.* The court held that Halliburton and Brown and Root were jointly liable for the infringement. *Id.* at 1389.

Other courts have used different language to describe a standard for joint liability for infringement. Those courts have held that "some connection" must exist between entities that perform separate steps of the patented method. *See Marley Mouldings Ltd. v. Mikron Indus., Inc.,* 66 U.S.P.Q.2d 1701, 1703 (N.D.Ill.2003)("Under such facts, the party that is contracting out part of the process or method and then completing the process may be infringing the patented invention because that party, through its connection with the entity performing only part of the process, is in actuality performing the combination of each and every step of the claimed method."); *Cordis Corp. v. Medtronic*

*AVE, Inc.,* 194 F.Supp.2d 323, 349 (D.Del. 2002). The courts held parties can be jointly liable where the parties contracted for and controlled the performance of a specific step, *Marley Mouldings Ltd.,* 66 U.S.P.Q.2d at 1703, or where there was a "very close relationship," *Cordis Corp.,* 194 F.Supp.2d at 350.

For example, in *Marley Mouldings Ltd. v. Mikron Indus., Inc.,* 66 U.S.P.Q.2d at 1703, the alleged infringer contracted out the first step of a patented method. There was evidence that it specified the ingredients and the process for that step so that the product was "made to order ... based on certain directives from [the alleged infringer]." *Id.* Accordingly, the court denied its motion for summary judgment of noninfringement. *Id.*

In *Cordis Corp. v. Medtronic AVE, Inc.,* 194 F.Supp.2d at 349, the defendant manufactured stents for use in heart surgery. Physicians using the stents performed some of the first, third, fourth, and fifth steps of the method of the claim. *Id.* The stent manufacturer only performed step 2 when it manufactured the stent. *Id.* The court found there was sufficient evidence presented at trial to support the jury finding that the manufacturer has "some connection" to the physicians who implanted the stent. *Id.* at 350. Specifically, there was evidence that the manufacturer supplied samples to doctors, taught the doctors how to use them, and recruited the doctors into clinical trials. *Id.*

Other courts have held one party liable for steps performed by other parties where it directed or controlled the actions of the other parties, *Free Standing Stuffer, Inc. v. Holly Development Co.,* 187 U.S.P.Q. 323, 333 (N.D.Ill.1974), or where it contracted out one conventional step while performing the rest of the process. *Metal Film Co. v. Metlon Corp.,* 316 F.Supp. 96, 110 (S.D.N.Y.1970). A recent

decision in this district emphasizes the connection or control required to hold one party liable for infringement of a method claim where some steps are performed by a different party.

In *Hill v. Amazon.com, Inc.*, 2006 WL 151911 (E.D.Tex.2006), the patents-in-suit concerned electronic catalog systems and methods. *Id.* at * 1. The patents described "storing constant and variable data relating to products on a main computer," operated by the defendants, and a remote computer, operated by the customers, that "periodically updat[ed] the constant data stored on the remote computer with data received from the main computer." *Id.* The defendants moved for summary judgment of noninfringement on the ground that they did not perform the steps that related to the remote computers. *Id.*

The court held that an online retailer could be liable for direct infringement where the defendants exerted sufficient control or had a sufficient connection to users operating the remote computers required by the claims. *Id.* at *2. The court stated not just any connection is sufficient; "in the absence of an agency or contractual relationship, the case law appears to require a showing that the defendant and the third party are connected at least to the extent that the defendant must actually direct the third party to perform the remaining steps of the method." *Id.* Stated differently, the court noted that although proof of an agency relationship or concerted activity would be sufficient to impose liability in circumstances where the party does not perform all of the steps of the claim method, "such a showing is not invariably required." *Id.*

Using this standard, the court held the plaintiff in *Hill* created a triable fact issue. *Id.* at *3. The court held the plaintiff's evidence, viewed in the light most favorable to the plaintiff, established "that the defendants designed their websites so as to control the product selection by the customer." *Id.* The court observed that navigation within the website was circumscribed by the links provided to the customers. *Id.* at *3. The defendants designed their websites with an awareness of the web browser capabilities possessed by their customers, and various defendants made suggestions to the customers to update their browsers or modify the browser setting. *Id.* The record also suggested that the defendants took "advantage of the browser caching capabilities when designing their websites so as to permit the remote computer's browser to cache certain items and not others," and the defendants' employees accessed the websites to "perform troubleshooting and customer service tasks." *Id.* Thus, the sufficient control or connection standard was satisfied because the retailers designed their websites "so as to control the product selection by the customer." *Id.*

It was also important that the relationship relied upon to establish connection or control was the same relationship described in the patent claims. The patent in *Hill* claimed a method for generating information relating to a product using main and remote computers. *Id.* at * 1.

### 2. Analysis

A method claim is directly infringed only by one performing the steps of the patented process. *Joy Techs.*, 6 F.3d at 773, 775. A method claim is not directly infringed by a party that does not perform any of the claim's operative steps. *See Joy Techs.*, 6 F.3d at 773–4 (Sale of device that infringes process claims when used by others is not direct infringement under 271(a)). Here, the claimed method is carried out by the Accused Systems, and Macerich does not take part in or control the operation of the

Accused Systems. (Dooley Aff. ¶ 7)(Salo Aff. ¶¶ 6–7)(Lerner Aff. ¶¶ 6–7).

Instead, the Accused Systems are owned, operated, managed, and controlled by Red Five, an independent web hosting company. (Dooley Aff. ¶¶ 4–6). None of Plaintiff's evidence shows that Macerich was involved in the decision to implement the Apache and Tomcat software at the time the decision was made. Instead, the evidence demonstrates that Macerich was not involved in the decision. Red Five selected and implemented the allegedly infringing web servers for its own reasons and based on its own judgment, and Macerich did not consider or approve the selection.

Specifically, in this regard, Mr. Dooley testified that Macerich did not have any involvement in choosing a configuration for the web servers; rather, the decision was made by Red Five (Dooley Dep. at 117–18). Similarly, Mr. Chrystal testified Macerich did not give any input on configuring the Apache or Tomcat software; those choice were in Red Five's "domain of control." (Chrystal Dep. at 231–32). Moreover, the evidence demonstrates that work authorizations submitted by Red Five did not discuss or seek approval for the implementation of the allegedly infringing combination of Apache and Tomcat software.

Direct infringement of a device, product, apparatus or system claim occurs only by the person that actually makes, uses, sells, offers for sale, or imports the apparatus containing each and every limitation of the claim, either literally or under the doctrine of equivalents. *See, e.g., Cross Med. Prods.*, 424 F.3d at 1310–11 (Manufacturer of medical device could not be liable for direct infringement of apparatus claims where doctors using medical device assembled infringing apparatus while performing surgery). Here, Macerich does not make, use, sell, offer for sale, or import the Ac-

cused Systems. (Salo Aff. ¶¶ 6–7)(Lerner Aff. ¶¶ 6–7). Instead, those systems are assembled, configured, owned and operated by an independent web hosting provider. (Dooley Aff. ¶¶ 4–5). Consequently, it is the independent service provider and not Macerich that makes or uses the Accused Systems.

■ Liability for direct infringement of a patented process where the steps of the process are performed by separate entities requires "the participation and combined action(s)" of both entities. *On Demand Machine Corp.*, 442 F.3d at 1344. Specifically, multiple parties may work together to accomplish the claimed method, *Shields*, 493 F.Supp. at 1388–89, or one party may direct the actions of another party, *Free Standing Stuffer*, 187 U.S.P.Q. at 333, or specify the details for performing a unique step, *Marley Mouldings*, 66 U.S.P.Q.2d at 1703, or contract out a conventional step while performing the rest of the process, *Metal Film*, 316 F.Supp. at 110. There is no authority, however, for imposing liability for direct infringement on a party that does not perform any of the steps of the patented method.

Plaintiff contends that the claimed methods are carried out by the Accused Systems when they are operated to host Macerich's websites. However, the Accused systems are owned and operated entirely by Red Five (Dooley Aff. ¶¶ 5–6)(Salo Aff. ¶¶ 6–7)(Lerner Aff. ¶¶ 6–7), so Macerich does not perform any of the steps of the patented method. In addition, Macerich does not specify any part of the Accused Systems or direct their method of operation. (Dooley Aff. ¶ 7)(Salo Aff. ¶¶ 10–11)(Lerner Aff. ¶¶ 10–11). Macerich contracts for the web hosting service, generally, and Red Five independently determines an appropriate and convenient method for providing the service. (Dooley Aff. ¶ 7)(Salo Aff. ¶¶ 7, 10–11)(Lerner Aff.

¶¶ 7, 10–11). Macerich is indifferent as to the particular system or method employed. (Dooley Aff. ¶ 7).

Further, Macerich does not simply contract out the performance of a conventional step while performing the rest of the claimed process. On the contrary, the Accused Systems are selected, configured, and operated entirely by Red Five. (Salo Aff. ¶¶ 10–11)(Lerner Aff. ¶¶ 10–11). Macerich does not contract for any particular method or step. (Dooley Aff. ¶ 7).

Finally, Macerich does not design its web pages "so as to control" how Red Five must host them. *See Hill,* 2006 WL 151911. The Accused Systems used by Red Five employ Apache Web Server and Tomcat Servlet Container software, but that is just one possible way to host and serve Macerich's web pages. (Dooley Aff. ¶¶ 10–11). It is not dictated by or required to host Macerich's web pages. (Dooley Aff. ¶ 8). Red Five no longer uses the accused technology. (Dooley Aff. ¶ 16, 18). Instead, Red Five now uses CGI technology, which Macerich asserts is admitted prior art to the epicRealm Patents, to provide the same or greater level of functionality for Macerich. *(Id.).* Macerich did not design its web pages "so as to control" how Red Five would host them, much less design them "so as to control" Red Five to host them in an infringing manner. *Hill v. Amazon.com, Inc.,* 2006 WL 151911 at *3.

 Plaintiff asserts, however, that there is a written agreement between Macerich and Red Five for the provision of web hosting services (Salo Dep. at 31, ex. 4), and under *Hill,* such an agreement is sufficient by itself to impose liability on Macerich for direct infringement. If the Court disagrees, Plaintiff contends there is a sufficient connection between Macerich and Red Five to impose such liability even absent such agreement. Plaintiff asserts Red Five is not "independent" from Mace-

rich, and Macerich does not purchase web hosting services from Red Five through a typical, arm's-length, buyer-seller transaction. Rather, according to Plaintiff, Red Five provides tailored, customized services to meet the specific needs of Macerich.

Plaintiff relies on evidence that before Red Five can make any changes to the Macerich web sites, it must first notify Macerich of the method for implementing the work in question and then obtain an executed work authorization from Macerich. (Lerner Dep. at 29–30, 32–33)(Salo Dep. at 40–42)(Dooley Dep. at 22, 51–52). After obtaining an executed work authorization, Red Five employees work closely with Macerich employees to ensure that Macerich is satisfied with the implementation of the specific project. (Lerner Dep. at 21–22, 32)(Salo Dep. at 40)(Dooley Dep. at 47–48, 50–51). Mr. Lerner admitted at his deposition that his key responsibilities include "managing" Red Five and working with Red Five to implement approved projects. (Lerner Dep. at 70–74).

According to Plaintiff, Macerich had full knowledge of the Apache and Tomcat server software that Red Five used to host Macerich's websites. (Dooley Dep. at 73–81, exs. 14, 15)(Lerner Dep. at 91–95, ex. 19). For example, Macerich approved a work authorization on June 17, 2004 that included the transition of Macerich's individual mall websites over to a system using the Apache and Tomcat software. (Dooley Dep. at 73–75, ex. 14). Through executed work authorizations, Macerich also directed Red Five to write new code to interact with the Tomcat software. (Dooley Dep. at 38, 40–45, 51–54, ex. 7). Macerich also directed Red Five to add new functionality to the server by "leverag[ing]" Red Five's existing use of the Apache and Tomcat software. (Dooley Dep. at 58–61, 78, ex. 10). Finally, Red Five reconfigured the Apache and Tomcat

software to satisfy specific needs that Macerich communicated to Red Five. (Dooley Dep. at 80–81, ex. 15). According to Plaintiff, Macerich therefore directed the performance of the infringing activities, thus making it liable for direct infringement under *Hill.*

The Court disagrees with Plaintiff that the written agreement between Macerich and Red Five for the provision of web hosting services is also sufficient to impose liability for direct infringement on Macerich under *Hill.* The Court also finds, viewing the evidence in the light most favorable to Plaintiff, an insufficient connection between Macerich and Red Five to impose such liability. Despite suggestions by epicRealm to the contrary, Macerich did not approve a work authorization specifically allowing Red Five to host Macerich's mall websites using the Apache and Tomcat software. Rather, Macerich approved a work authorization, which was cited by epicRealm (Dooley Dep. at 73–75, Ex. 14), but that authorization did not include a diagram or description of the allegedly infringing software. (Dooley Dep. at 104–105). Macerich simply approved a major update to the look and feel of its websites, and Red Five conveniently timed the implementation of its Apache and Tomcat system to coincide with the visual redesign. (Dooley Dep. at 18–19).

*After* Red Five implemented the web server based on Apache and Tomcat software, Macerich worked closely with Red Five to manage the content and the look and feel of its websites. Red Five provided and customized a content management tool, called Project Site Manager ("PSM"), which gave Macerich control over the content and design of its web pages. (Dooley Dep. at 43–44, 102–104, 120–121). Adding functionality to this program required rewriting Java code for the PSM software, or the web pages that incorporate the con-

tent (Dooley Dep. at 53), but it did not require customizing the Apache and Tomcat software or changing how Apache and Tomcat processed requests for Macerich's web pages. (Dooley Dep. at 43–44, 103–104, 120–121). Plaintiff presents no evidence that Red Five customized the allegedly infringing combination of Apache and Tomcat for Macerich.

Despite working closely with employees at Red Five, Macerich presents evidence that it did not know how the accused systems were configured or how they operated. Macerich persuasively argues it could not have known based on the information available to it. For example, in an email to Mr. Lerner, Red Five's James Chrystal explained that Apache and Tomcat must be separately configured to redirect old links to updated web pages. However, it is not clear from this message that Apache and Tomcat were being used in combination to serve a Macerich web page because Tomcat can be configured to operate as a stand alone web server on a machine separate and apart from Apache. Accordingly, this email did little to inform employees at Macerich how Red Five's web server was configured *(See* Dooley Dep. at 112–114).

Likewise, a Disaster Recovery Plan cited by epicRealm did nothing to inform Macerich about the combination of software used to serve its web pages. The document was not even prepared by Macerich; it was prepared by Red Five. (Dooley Dep. at 124). More importantly, it lists and documents back-up protection for numerous software titles that are not even used on the web servers hosting Macerich's web pages. Accordingly, Macerich would not have known exactly what software was used, let alone how Red Five's web servers were actually configured.

Regarding Plaintiff's evidence of Ed Coppolla's involvement in the two companies, Macerich asserts its officers and di-

rectors had no involvement in, or control over, Red Five's selection of web server software. Mr. Coppolla was an officer and director of Macerich, and a family member of Bob Dooley, who helped Mr. Dooley purchase Red Five in 1988 (Dooley Dep. at 94–95). Even though he was initially listed as a director, Macerich asserts Mr. Coppolla was always a "silent investor" in the company (Dooley Dep. at 97), and by the time Red Five was choosing to implement Apache and Tomcat, Mr. Coppolla was no longer a director and had given up his controlling financial interest in the company (*Compare* Dooley Dep. at 95–98 *with* Dooley Dep. at 14–15).

Finally, since October of 2005, Macerich's websites have been hosted on a server using CGI technology. (Dooley Aff. ¶ 18). This system is not identified in epicRealm's Preliminary Infringement Contention because, according to Macerich, it operates according to the prior art. Importantly, for purposes of this discussion, Macerich's websites could have been hosted in this manner all along (Dooley Dep. at 122), and Red Five could have accommodated Macerich, had it asked, by coding CGI applications in an older software language like C++. (Dooley Dep. at 128–129, 131).

Again, Plaintiff points to evidence of Macerich's close working relationship with Red Five after Red Five made the choice to implement the Apache and Tomcat software in 2003 and after Macerich's websites were transitioned to the new system. However, Macerich presents evidence that it did not participate in the decision to transition to Apache and Tomcat when it was made in 2003, and like Red Five's other customers, its websites were transitioned behind-the-scenes while Macerich was focused on a visual upgrade to its website. Macerich has also demonstrated that since that time Macerich's involve-ment in customizing the PSM tool has not affected how the allegedly infringing combination of Apache and Tomcat operate to process requests and serve web pages.

Plaintiff's reliance on *Lineguard Inc. v. Linetec, Inc.*, 1987 WL 11832 (N.D.Ill. June 1, 1987) and *Free Standing Stuffer, Inc. v. Holly Development Co.*, 187 U.S.P.Q. 323, 333 (N.D.Ill.1974) is insufficient to support liability for infringement. In *Lineguard*, the defendant was incorporated to market tape products, and it had a particular infringing tape manufactured on its behalf. Consequently, it could be held liable for infringement because manufacturing the infringing tape was the object of its agreement with the manufacturer. In contrast, the object of Macerich's contract with Red Five was web hosting services in general. Macerich did not specify the type or configuration of web server that Red Five must use, and Macerich was not given the opportunity to consider and approve the web server before it was chosen independently by Red Five. Instead, Macerich is more like the watch maker in *Keplinger v. DeYoung*, 10 Wheat. 358, 23 U.S. 358, 365, 6 L.Ed. 341 (1825), discussed in more detail in the Court's discussion on indirect liability, who had no liability resulting from watch chains made by an infringing process because he contracted to purchase the chains without specifying the process by which they were to be made.

In *Free Standing Stuffer*, the other case relied upon by Plaintiff, the defendant did not itself carry out any steps of the patented method, but it directed the actions of others, giving precise instructions, which when carried out, resulted in the infringement. *Free Standing Stuffer*, 187 U.S.P.Q. at 333. In contrast, Macerich did not direct Red Five in selecting or implementing the allegedly infringing combination of software. Moreover, Macerich's

requests for modifications to the PSM tool did not affect how the allegedly infringing software operated.

Moreover, the Court in *Hill* did not suggest that liability would arise simply because of the vendor-customer relationship. Rather, the court concluded that potential liability for the vendor was reasonable even though some steps were taken separately by the customer because the claimed invention was directed to a transaction involving a vendor-customer relationship. Unlike the claims at issue in *Hill*, the claims of epicRealm's Patents are not directed to activities occurring in a vendor-customer transaction. Accordingly, Macerich cannot be liable for infringement under *Hill*.

The Court finds no genuine issues of material fact exist regarding whether performs any of the steps of the claimed methods. Therefore, Macerich cannot be liable for infringement of those claims under § 271(a) as a matter of law. The Court recommends this portion of Macerich's motion for summary judgment be granted.

## C. Indirect Infringement Under 35 U.S.C. § 271(b) (Inducing Infringement)

### 1. Applicable Law

Liability for inducing infringement is statutorily defined in 35 U.S.C. § 271(b). Section 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "In order to succeed on a claim of inducement, the patent must show, first that there has been direct infringement, and second, that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed.Cir.2005)(quotations omitted). "[M]ere knowledge alone of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." *Warner–Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1364 (Fed.Cir.2003).

Active inducement requires an "affirmative act of some kind." *Tegal Corp. v. Tokyo Electron Co.*, 248 F.3d 1376, 1378 (Fed.Cir.2001). In particular, active inducement requires "active steps taken to encourage direct infringement." *MEMC Elec. Materials*, 420 F.3d at 1379 (quoting *Metro–Goldwyn–Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 125 S.Ct. 2764, 2779, 162 L.Ed.2d 781 (2005)(construing the law regarding active inducement in the context of patent infringement and applying that law in the context of copyright infringement)); *Warner–Lambert*, 316 F.3d at 1364 (drug manufacturer not liable for inducement without evidence of encouraging or promoting doctors to infringe the method patent). In addition, the inducer must actually intend "to cause the acts which constitute the infringement." *Hewlett–Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1469 (Fed.Cir.1990). The intent described in *Hewlett–Packard Co.* is not all that is needed. Rather, the intent requirement for inducement requires:

> "more than just intent to cause the acts that produce direct infringement. Beyond that threshold knowledge, the inducer must have an affirmative intent to cause direct infringement.... Accordingly, inducement requires evidence of culpable conduct, directed to encourage another's infringement, not merely that the inducer had knowledge of the direct infringer's activities."

*DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed.Cir.2006)(en banc section).

██ It is active inducement to provide instructions describing how to engage in an infringing use. *See, e.g., Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1364 (Fed.Cir.2006)(finding active inducement where defendant packaged an instruction sheet with its unassembled product showing how to assemble the product into an infringing apparatus); *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354 (Fed.Cir.2004)(finding active inducement of infringement based on defendant's publications describing and promoting use of a patented method). Likewise, it is active inducement to advertise a product being used in an infringing manner. *See, e.g., Snuba Int'l, Inc. v. Dolphin World, Inc.*, 2000 WL 961363, at *7, 2000 U.S.App. LEXIS 16946, *18 (Fed.Cir.2000)(promotional materials showing use of product in infringing manner supported liability for active inducement).

██ In addition to active steps encouraging infringement, active inducement requires specific intent "to cause the acts which constitute the infringement." *Hewlett–Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1469 (Fed.Cir.1990). This intent cannot exist where the actions allegedly encouraging infringement could also encourage alternative, noninfringing acts. *See MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323, 1333 (Fed.Cir.2005); *see also, Moba v. Diamond Automation*, 325 F.3d 1306, 1318 (Fed.Cir.2003); *Warner–Lambert*, 316 F.3d at 1364–65. To form a specific intent to cause the acts which constitute infringement, an alleged inducer must have knowledge of the infringing acts. *See MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323, 1332–33 (Fed.Cir. 2005).

██ It is not sufficient, however, to have knowledge about only some of the allegedly infringing acts. · *See id.* at 1332–

33. Where the alleged inducer lacks knowledge about some of the infringing acts, there can be no liability for active inducement. *See id.* For example, in *MercExchange, LLC v. eBay, Inc.*, 401 F.3d at 1332, the Federal Circuit held that, in order to demonstrate the intent required for active inducement, the patentee must at least be able to show that the alleged inducer had knowledge of the infringing acts. The court went on to hold the defendant not liable for active inducement because it encouraged activities related to some but not all limitations of the asserted claims. *Id.* at 1332–33. The only limitations that the defendant was found to have encouraged were those for which defendant had knowledge. *See id.* at 1332. In particular, the defendant had encouraged the posting of goods for sale on the internet because it provided engineers to facilitate those activities. *Id.* Thus, the defendant could be shown to have knowledge of that activity. With respect to the other activities constituting the infringement, there was no evidence cited by the court to show that the defendant had any knowledge of those activities. *See id.* at 1332–33.

██ Specific intent to cause the acts which constitute infringement cannot be inferred from actions that merely make possible both infringing and noninfringing activities. *Warner–Lambert*, 316 F.3d at 1365. Even having knowledge of infringing activities that do occur is not enough. *Id.* Rather, the alleged inducer must specifically encourage those infringing activities to be liable for active inducement. *Id.* at 1364.

For example, in *Warner–Lambert Co. v. Apotex Corp.*, 316 F.3d at 1363, a pharmaceutical manufacturer sold a drug approved for the treatment of epilepsy. In practice, doctors prescribed the drug for numerous off-label uses, including the in-

fringing use of treating neurodegenerative diseases, and the drug manufacturer was alleged to have knowledge of this infringing activity by the doctors. *Id.* The Federal Circuit upheld summary judgment that the drug manufacturer was not liable for active inducement, stating that the drug manufacturer's "knowledge is legally irrelevant. In the absence of any evidence that [the drug manufacturer] has or will promote or encourage the doctors to infringe the neurodegenerative method patent, there has been raised no genuine issue of material fact." *Id.* at 1364.

## 2. Analysis

■■■ For Plaintiff to establish that Macerich induced Red Five's infringement, Plaintiff is required to show that Red Five's actions induced infringing acts and that it knew or should have known that its actions would induce actual infringement. *DSU Med. Corp. v. JMS Co.,* 471 F.3d 1293, 1304 (Fed.Cir.2006)(en banc section). Plaintiff must prove that Macerich "actively and knowingly aided and abetted another's direct infringement." *Id.* at 1305. Inducement "requires evidence of culpable conduct, directed to encourage another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *Id.* at 1306. As noted above, there can be no liability for active inducement where the alleged inducer's actions may lead to either infringing or noninfringing acts, and there is no encouragement of the infringing acts, specifically. *Warner–Lambert,* 316 F.3d at 1364–65.

Plaintiff first asserts a viable, non-infringing alternative was not available for hosting Macerich's websites during the period in which the sites were hosted using the Apache and Tomcat software. Specifically, Plaintiff refers to Mr. Dooley's testimony that Red Five now hosts Macerich websites using CGI technology but with a different programming language. (Dooley Dep. at 24–25). According to Plaintiff, Mr. Dooley confirmed that this new system is different from and faster than the CGI technology that was used to host Macerich's websites prior to the transition to the Apache and Tomcat software. (Dooley Dep. at 25, 128–129). Mr. Dooley also confirmed that this technology was not available when the websites were transitioned to the Apache/Tomcat combination because Red Five did not know that such technology existed at that time. (Dooley Dep. at 25–26, 129).

Plaintiff asserts even if this alternative had been available, Macerich would still be liable for inducement to infringe because Macerich had full knowledge of Red Five's use of the Apache and Tomcat software identified in epicRealm's Preliminary Infringement Contentions. (Dooley Dep. at 73–81, exs. 14, 15)(Lerner Dep. at 91–95, ex. 19). According to Plaintiff, through executed work authorizations, Macerich directed Red Five to write new JSP code that works with a Tomcat servlet container. (Dooley Dep. at 38, 40–45, 51–54, 101–102, ex. 7). Plaintiff asserts Macerich also directed Red Five to add a retailer database to the server by "leverag[ing]" Red Five's existing use of the Apache and Tomcat software (Dooley Dep. at 58–61, 78, ex. 10), and Macerich's specific web hosting needs also required Red Five to reconfigure the Apache and Tomcat software. (Dooley Dep. at 80–81, ex. 15).

Plaintiff contends Macerich, with full knowledge of the infringing software, directed and encouraged Red Five to provide it with the infringing web hosting services. Plaintiff maintains this proves Macerich's intent "to cause the acts which constitute the infringement," which is in turn sufficient to impose liability for inducement to infringe.

On the other hand, Macerich relies, in part, on *Keplinger v. DeYoung,* 10 Wheat. 358, 23 U.S. 358, 365, 6 L.Ed. 341 (1825) and asserts an arm's-length contract for the purchase of a service does not give rise to liability for active inducement when the vendor, and not the purchaser, selects the manner in which the service is provided. In *Keplinger,* the Supreme Court considered whether a watch manufacturer was liable for inducing infringement by entering into an output contract to purchase all the watch chains made by a third-party chain maker who produced them on an infringing machine. *Id.* at 362–67. The watch maker knew which machine the chain maker would use and knew that the machine infringed the plaintiff's patent. *Id.* at 362. The contract, however, did not require the watch chains to be made on any particular machine but, instead, left that choice open to the chain maker. *Id.* at 364–65. The Court held that the contractual relationship could not support indirect liability of the watch maker for the chain maker's infringement. *Id.* at 365.

The Court, *in Keplinger,* also indicated that the result may have been different if the watch maker had intended the watch chains to be made on the infringing machine, as would be evident if the watch maker had sought specifically to hire the infringing machine to produce the watch chains. *Id.* at 364. That issue was not before the Court in *Keplinger. Id.* Lower courts have subsequently addressed it.

In *General Electric Co. v. De Forest Radio Co.,* 28 F.2d 641, 648 (3d Cir.1928), the court held a purchaser of wire drawn from tungsten purified by an infringing process liable for inducing infringement because the wire that was purchased was specially ordered with the intent that it be made of tungsten. In *General Electric,* the claimed process was for a method of making substantially pure tungsten. *Id.*

at 645–46. Tungsten, once purified, was prized as a metal for its high ductility and high tensile strength. *Id.* at 644. It was, therefore, perfectly suited for drawing into long, thin filaments. *Id.* The defendant specially-ordered a thin tungsten wire and was held liable for inducing infringement. *Id.* at 648.

The *General Electric* court found the defendant had encouraged the infringement because it had specially ordered a tungsten wire. *Id.* The fact that the defendant sought specifically to purchase tungsten wire—the type of material made by the patented process—rather than any wire, was evidenced by the transaction with the wire manufacturer. *See id.* The defendant approached a manufacturer of tungsten wire, and finding no wire small enough for its purpose, it asked for a specially-made wire of smaller size. *Id.* The manufacturer did not believe it could be done, but the defendant "order[ed]" the manufacturer to try. *Id.* The manufacturer succeeded, and the defendant purchased the wire. *Id.*

The transaction, especially the "order" to try, suggests an expectation of success on the part of the defendant. Thus, it is evident that the defendant sought out the manufacturer specifically for the purpose of ordering a tungsten wire. *Id.* at 648. When the defendant ordered the specially-made tungsten wire, it encouraged infringement. Accordingly, the court held the defendant liable for inducing infringement of the process for making purified tungsten. *Id.*

Similarly, in *Trustees of Columbia Univ. v. Roche Diagnostics GmbH,* 272 F.Supp.2d 90, 107 (D.Mass.2002), the court held the defendant liable for inducing infringement when it purchased bulk pharmaceuticals made using infringing cell lines because it acted as an "accessory before the fact with full knowledge that

[the manufacturer] would utilize [the infringing cells]" and encouraged production using the infringing cells. In *Roche*, the patent-in-suit covered a line of genetically engineered cells used to make a drug known as EPO. *Id.* at 96. The patent did not cover the EPO itself. *Id.* The defendant, Roche, purchased bulk EPO from GI who developed the infringing cells and used them to manufacture the EPO. *Id.* at 98–99. The court found that Roche was "intimately involved with inducing GI to make bulk EPO" using the infringing cell lines. *Id.* at 107. In particular, Roche knew that GI was developing the infringing cell line to produce EPO, and Roche funded GI's research and development of commercial EPO production using those cells. *Id.* at 107.

In addition, the parties agreed to exchange trade secrets and agreed to joint ownership of technology developed during the project. *Id.* The parties' relationship was a "collaboration" to develop commercial production of EPO using the infringing cells and not merely a contract to purchase goods. *Id.* Thus, Roche's support encouraged GI's infringement, and the court held Roche liable for inducing infringement because Roche specifically encouraged GI to produce EPO using the infringing cells. *Id.*

Here, Defendant has produced evidence demonstrating that Macerich has an arm's-length contract to purchase web hosting services from Red Five. (Lerner Aff. ¶ 7)(Salo Aff. ¶ 7). Red Five is an independent contractor and not a subsidiary or affiliate of Macerich. (Dooley Aff. ¶ 4). Macerich does not select the process by which the service is provided or the systems used to carry out the process. (Dooley Aff. ¶ 7)(Salo Aff. ¶¶ 10–11)(Lerner Aff. ¶¶ 10–11). There is evidence indicating Macerich is indifferent as to the particular process or configuration used by Red Five to operate its web servers, and Macerich leaves it entirely to Red Five to choose a configuration that is appropriate and convenient to provide the web hosting service. *(Id.)*. Plaintiff has produced no evidence to the contrary.

In addition, there is evidence that Macerich did not learn of Red Five's use of the Accused Systems until after this suit was filed. Macerich knew that Red Five used a software application known as Apache on its web servers. (Salo Aff. ¶¶ 12). However, Macerich did not know what the Apache software was used for. (Salo Aff. ¶¶ 14–15).

Macerich asserts Apache is only one part of the allegedly infringing combination of hardware and software comprising the Accused Systems *(see* PICs, at 1–3), and Apache can be, and was in fact, used in a noninfringing configuration that is admitted prior art to the epicRealm Patents (Dooley Aff. ¶¶ 9, 16, 18–19)(*see also* '554 patent, 4:11–31 and Fig. 3). Therefore, according to Macerich, its knowledge that Red Five used Apache does not equate to knowledge of the Accused Systems; *i.e.,* it does not equate to knowledge of the allegedly infringing acts.

In an email from James Chrystal, Macerich learned that the Apache and Tomcat applications were used in connection with serving its web pages. (Dooley Dep. at 75, Ex. 15). However, both Apache and Tomcat can be configured to operate separately (Dooley Dep. at 113), so Macerich would not have known that Apache and Tomcat were used in combination. (Dooley Dep. at 112–114). Likewise, Macerich could not have known from the Red Five Disaster Recovery Plan which combination of software Red Five was using because the Plan listed numerous pieces of software that were not used to serve Macerich's web pages. (Dooley Dep. at 124–126, Ex. 24, at MAC 12510). The Court finds insufficient

evidence to demonstrate that Macerich had specific intent to cause the acts which constitute the infringement. *Warner–Lambert,* 316 F.3d at 1364.

Also, there can be no liability for active inducement when the actions alleged to induce infringement could also lead to non-infringing activity, and there is no encouragement of the infringing activity in particular. *Warner–Lambert Co. v. Apotex Corp.,* 316 F.3d 1348, 1365 (Fed.Cir.2003). Macerich has presented evidence demonstrating that its websites could have been served from a computer running prior art CGI applications. Macerich did not specify the systems or methods that would be used. (Dooley Aff. ¶ 7, 12)(Salo Aff. ¶¶ 10–11)(Lerner Aff. ¶¶ 10–11), and the Accused Systems are not the only systems that are capable of hosting and serving Macerich's web pages. (Dooley Aff. ¶ 8). Rather, Macerich's web pages can be hosted and served equally well using CGI technology. (Dooley Aff. ¶¶ 9, 16, 18–19)(*see also* '554 patent, 4:11–31 and Fig. 3.) Red Five is currently using CGI technology to provide its web hosting services to Macerich. (Dooley Aff. ¶¶ 16, 18). Thus, Macerich's web pages can be served by systems and methods that cannot infringe the epicRealm Patents.

Plaintiff takes issue with the fact that Red Five's current CGI applications are written in a software language called Ruby, which was not known to Red Five when it implemented the server based on Apache and Tomcat. Macerich asserts this is irrelevant because Ruby is merely a software language used to write the CGI applications. (Dooley Dep. at 105–106). The same applications that Red Five uses today could have been coded previously in another software language, like C++. (Dooley Dep. at 128–129, 131).

Finally, an en banc panel of the Federal Circuit recently clarified, in the context of induced infringement, that the intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement. *DSU Med. Corp. v. JMS Co.,* 471 F.3d 1293, 1306 (Fed.Cir.2006). A plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements; the requirement that the alleged infringer knew or should have known his actions would induce actual infringement necessarily includes the requirement that he or she knew of the patent. *Id.* at 1304. Inducement "requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *Id.* at 1306.

Here, there are no genuine disputes of material fact on this question. Plaintiff has presented nothing that would show that Macerich caused Red Five to infringe the patent. Macerich did not encourage Red Five's use of the Accused Systems. (Dooley Aff. ¶¶ 7–8). Rather, Red Five submitted work authorizations in terms of cost and time required to implement web hosting functions for Macerich, and Macerich approved the work authorizations on those terms. (Salo Aff. ¶ 11)(Lerner Aff. ¶ 11). These work authorizations did not describe the systems or methods that would be used. (*Id.;* Dooley Aff. ¶ 12). Therefore, Macerich contracted for services that could be provided in a noninfringing manner and did not encourage Red Five to use the allegedly infringing systems and methods. Additionally, Plaintiff has not presented any evidence to show that Macerich intended to induce infringement.

For the above reasons, Macerich cannot be liable for active inducement as a matter of law. The Court recommends this portion of Macerich's motion for summary

judgment be granted. Based on the foregoing, it is

**RECOMMENDED** that Macerich's Motion For Summary Judgment of No Infringement (Docket Entry # s 159/188) be **GRANTED.** It is further

**RECOMMENDED** that Plaintiff's above-entitled and numbered cause of action against The Macerich Company be **DISMISSED WITH PREJUDICE.**

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn,* 474 U.S. 140, 148, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Rodriguez v. Bowen,* 857 F.2d 275, 276–77 (5th Cir.1988).